**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**NIXON GEAR, INC., Respondent.**

**No. 671, Docket 80–4239.**

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1981.

Decided May 26, 1981.

Richard S. Zuckerman, N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for petitioner.

Brian E. Hayes, Skoler, Abbott & Hayes, P.C., Springfield, Mass., for respondent.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

The National Labor Relations Board ("the Board") seeks enforcement of an or-

der issued against Nixon Gear, Inc. ("the Company") on August 27, 1980, directing the Company to bargain in good faith with District Lodge No. 137, International Association of Machinists & Aerospace Workers, AFL–CIO ("the Union"). Following the Union's narrow victory in a representation election, the Company filed objections to certain pre-election conduct on the part of the Union. Without holding an evidentiary hearing upon the Company's objections, the Board granted certification to the Union and subsequently issued the order, enforcement of which is requested here. We deny enforcement of the Board's order.

## BACKGROUND

The Company manufactures and sells custom gears at its facility in Syracuse, New York, where the representation election was held. After the Union filed a petition for certification as the collective bargaining representative for eligible employees at the Company's Syracuse facility, the Board conducted a representation election on December 19, 1979. Of the 45 eligible employees, 44 voted. The result was 23 to 21 in favor of the Union. No ballots were challenged, but the Company filed timely objections to conduct affecting the results of the election. The Company objected, *inter alia*, that the Union had circulated campaign literature containing material misrepresentations to which the Company did not have adequate time to respond and that the Union had made improper financial and job-related inducements to eligible employees. The Company requested a hearing on its objections.

The Regional Director conducted an investigation of the objections pursuant to section 102.69 of the Board's Rules and Reg-

ulations, 29 C.F.R. § 102.69 (1980), but did not hold a hearing.[1] Based upon his investigation, the Regional Director recommended to the Board that all of the Company's objections be overruled and that the Union be certified. His investigation revealed the following.

The Company's first two objections alleged that the Union had distributed campaign literature which contained material misrepresentations. At issue were statements made in a handwritten notice captioned "Ask Yourselves Why." The Company contended that the following four paragraphs of this handbill contained material misrepresentations:

Ask yourselves why the company:

. . . .

B.  Has awarded pay raises to certain individuals and *most notably not* to known pro-union persons? This smacks of discrimination.

C.  Offered $10 hourly to pro-union man to campaign against union? He refused.

D.  Would not inform the wife of an injured employee of procedures to follow for benefit of medical coverage, state disability, etc.?

E.  Will pay for only *4* days this shutdown instead of *5* days? This surely proves they care for you.

A.  22 (emphasis in original). Copies of the handbill were distributed by the Union to employees who attended the Union meeting held on December 15, 1979 and were further distributed at the plant early on the morning of December 18. The Company contended that it first became aware of the literature on December 18, the day before the election.

1.  Section 102.69 provides in pertinent part:
    (d) The action of the regional director in issuing a report on objections or challenged ballots, or both, following proceedings under § 102.62(b) or § 102.67, or in issuing a decision on objections or challenged ballots, or both, following proceedings under § 102.67, may be on the basis of an administrative investigation or, if it appears to the regional director that substantial and material factual issues exist which, in the exercise of his reasonable discretion, he determines may more

appropriately be resolved after a hearing, he shall issue and cause to be served on the parties a notice of hearing on said issues before a hearing officer. If the regional director issues a report on objections and challenges, the parties shall have the rights set forth in paragraphs (c) and (f) of this section; if the regional director issues a decision, the parties shall have the rights set forth in § 102.67 to the extent consistent herewith. 29 C.F.R. § 102.69(d) (1980).

The Regional Director listed the "testimony" concerning the truthfulness of each paragraph.[2] The Company produced evidence that the allegedly discriminatory pay raises denounced in Paragraph B were actually awarded pursuant to the Company's established practice of scheduling raises to coincide with employees' anniversary dates with the firm. Furthermore, the Company pointed out that some of the employees who received raises appeared to be actively supporting the Union by, for example, wearing Union buttons. With respect to Paragraph C, the Regional Director apparently misunderstood the Company's position. He stated that the Company admitted that the $10 per hour bribe was offered, but the company claims that it has consistently denied the bribe attempt.[3] With respect to Paragraph D, the Company conceded that an employee's wife had not been informed of procedures to follow to obtain benefits for her injured husband, but explained that this had occurred more than 2½ years earlier under the Company's previous owners. With respect to Paragraph E, the Company conceded that that year there had been four paid shut-down days instead of five, but explained that the reduction was caused by the different way that holidays fell in those years. The Regional Director concluded that none of the alleged misrepresentations warranted holding a hearing or overturning the election.

Turning to the Company's objection that the Union had made improper financial and job-related inducements to eligible employees, the Regional Director first reviewed statements from employee witnesses who claimed to have heard rumors that Larry Darling, a co-worker, had been promised more favorable employment at a local unionized plant of the Miller Brewing Company ("Miller") in return for his efforts on behalf of the Union at Nixon Gear. The testimony of those who had spoken with Darling showed that he was confident that he would obtain employment at Miller, where his wife already was employed. It appeared that Darling's activities on behalf of the Union had been limited to attending one or two Union meetings. The investigation failed to reveal that the Union itself told employees that it had offered a job to Darling or that Darling was an agent of the Union. Moreover, at least once early in the campaign, Darling denied the rumor. Based on all of the above, the Regional Director concluded that this portion of the Company's objection did not warrant a hearing and recommended that it be overruled.

The Regional Director was equally unmoved by another example of alleged improper financial and job-related inducements by the Union. The Company's complaint arose out of events at a Union organizational meeting held in late November. At that meeting, the Union presented a Union steward or official from Miller who compared the Nixon Gear benefits with those available at a Union plant where he had worked prior to obtaining employment at Miller. Witnesses who attended the meeting stated that they formed the impression that the Union had helped the speaker obtain his job at Miller, but conceded that neither the Union nor the speaker ever said this explicitly. The Regional Director dismissed their "testimony" as specu-

---

2. The record does not clearly set forth the methodology of the investigation. The Regional Director's repeated references to the "testimony" of the Company and employees, however, probably should not be taken to imply that anyone offered sworn oral testimony respecting the objections. The record contains written affidavits, but does not contain any transcripts. The Regional Director's conclusions apparently were drawn primarily from his review of the record submitted to him including the sworn statements of witnesses, documentary evidence, and the parties' statements of position, A. 11.

3. In its exceptions to the Regional Director's findings, the Company denied that such a bribe was ever offered and stated that it had consistently denied this allegation throughout the Regional Director's investigation. The Company requested that the Regional Director contact the former Company officer who allegedly had made the bribe, and provided the Regional Director with the information needed to contact him, A. 29 n.1, but apparently the Regional Director did not pursue the matter.

lative and, also without a hearing, recommended that this portion of the objection be overruled. After rejecting other Company objections not at issue here,[4] the Regional Director recommended that the Company's objections be overruled in their entirety and that a Certification of Representation be issued.

The Board declined to order a hearing and adopted the Regional Director's findings and recommendations with one change. Although the Regional Director found that the Company had admitted that its vice president had offered the $10 per hour bribe, the Board concluded that even if the accusation were false, such a misrepresentation would be insufficient, in the circumstances of this case, to warrant setting aside the election. On April 3, 1980 the Board certified the Union as the exclusive representative of the eligible employees at the Company.

After the Board's decision, the Union requested that the Company commence collective bargaining, but the Company refused. In response to the ensuing unfair labor practices complaint, the Company admitted its refusal to bargain, but raised the invalidity of the election as a defense. The Board granted the General Counsel's motion for summary judgment against the Company, finding that the Company's refusal to bargain violated §§ 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1) (1976), and issued the order which it now seeks to enforce.

## DISCUSSION

■ The Company argues that the evidence submitted by it in support of its objections was sufficient to require the Board to direct that an evidentiary hearing

be conducted. As the party seeking a hearing, the Company bears a heavy burden, *see Bausch & Lomb Inc. v. NLRB*, 404 F.2d 1222, 1226 (2d Cir. 1968). "The conduct of representation elections is the very archetype of a purely administrative function, with no *quasi* about it, concerning which courts should not interfere save for the most glaring discrimination or abuse," *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970), *cert. denied*, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971), lest appellate interference threaten the essential functioning of a system that governs, according to well-settled standards, the conduct of nearly 10,000 elections annually. *Henderson Trumbull Supply Corp. v. NLRB*, 501 F.2d 1224, 1228 (2d Cir. 1974). Nevertheless, according to those well-settled standards the Company was entitled to a hearing if "by prima facie evidence, it demonstrate[d] the existence of 'substantial and material factual issues' which, if resolved in its favor, would require the setting aside of the representation election." *NLRB v. Bristol Spring Manufacturing Co.*, 579 F.2d 704, 706–07 (2d Cir. 1978); *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1036 (2d Cir. 1974); *Polymers, Inc. v. NLRB*, 414 F.2d 999, 1004–05 (2d Cir. 1969), *cert. denied*, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970); *NLRB v. Joclin Manufacturing Co.*, 314 F.2d 627, 631–32 (2d Cir. 1963). With these general considerations in mind, we examine the Company's claim that the Board erred by not directing a hearing into the Union's alleged misconduct.

### A. The Misrepresentations

■ In this proceeding the Company raises two independent grounds for requir-

---

4. The Company does not challenge the Board's decision overruling these other two objections. In one of these objections, the Company alleged that the Union threatened eligible employees with physical harm, damage to personal property, and adverse changes in their working conditions if the Union failed to win the election. The Board overruled this objection because the Company presented no evidence in support of it and would not or could not pro-

vide the names of any potential witnesses. In its final objection, the Company alleged that "[b]y the foregoing, as well as other acts and conduct, [the Union] interfered with the employees' free choice in the election and with the laboratory conditions under which Board elections are to be conducted." The Board overruled this objection because it raised no specific allegations of misconduct other than those already made in the first four objections.

ing a hearing: the Union's alleged misrepresentations and its improper inducements to eligible employees. With regard to the Union's alleged misrepresentations, the Company presses upon us the impropriety of the Union's charge that the Company had "[o]ffered $10 hourly to [a] pro-union man to campaign against [the] union." The Board assumed *arguendo* that this charge was false, but, as the Board recognized, not every misrepresentation made in the course of a campaign requires the setting aside of the election. "A certain degree of inaccuracy and ambiguity is recognized as indigenous to campaign propaganda," *Baumritter Corp. v. NLRB*, 386 F.2d 117, 120 (1st Cir. 1967), because "[p]rattle rather than precision is the dominating characteristic of election publicity," *Olson Rug Co. v. NLRB*, 260 F.2d 255, 257 (7th Cir. 1958). We generally rely upon the parties themselves to correct inaccurate, untruthful statements, for when opposing parties publicly debate the merits of their positions we may confidently leave to the common sense of the voters the appraisal of the positions. *Linn v. United Plant Guard Workers*, 383 U.S. 53, 60, 86 S.Ct. 657, 661, 15 L.Ed.2d 582 (1966). Nevertheless, where a misrepresentation arises under circumstances which effectively preclude the voters from ascertaining its falsity, we do not hesitate to set aside the result of the representation election.

◼ The principal factors which guide our inquiry into the effect of the misrepresentation are well-known and are derived from the Board's decision in *Hollywood Ceramics Co.*, 140 N.L.R.B. 221, 224 (1962).[5] These factors are (1) whether the other party had adequate opportunity to reply and correct the misrepresentation; (2) the extent to which the declarant could reasonably be viewed by the employees as being in a position to know the facts; (3) the ability of the employees to evaluate the statement on the basis of their own independent knowledge of the facts; and (4) the influence it might reasonably have had upon the

employees. *Henderson Trumbull Supply Corp. v. NLRB, supra*, 501 F.2d at 1229. The Board found that, even if the Union's bribery charge was false, the election would not have to be set aside under these standards and, hence, refused to direct an evidentiary hearing to determine whether the charge was false. We now review whether that refusal to order a hearing exceeded the Board's discretion.

◼ The Company argues persuasively that it did not have a reasonable opportunity to reply to the Union's misrepresentation. The Company stated that it first learned of the misrepresentation on December 18, 1979, the day before the election. It is unlikely that the Company could have replied adequately before the election. Time would have been needed to learn the specifics behind the Union's charge, check their accuracy, and issue a denial. Even had this process been completed, the Company might well have been unable to contact all of the voters. Some of them may not have been at the plant that day and, under the Board's own rules, the Company could not order its employees to attend a meeting held for the purpose of rebutting the Union's charge. Such a "captive audience" meeting held by an employer within twenty-four hours of an election constitutes a *per se* ground for setting aside an election won by the employer. *Peerless Plywood Co.*, 107 N.L.R.B. 427, 429 (1953). Thus, the Company has demonstrated by prima facie evidence that it did not have an adequate opportunity to respond to the misrepresentation. The second and third factors of the *Hollywood Ceramics* test are also satisfied. The employees could reasonably have expected that the Union's charge was directly based on testimony from the employee who was offered the bribe and, since the charge did not specify which employee was bribed, the employees could not independently investigate the charge's truthfulness.

Therefore, the Board's refusal to order a hearing must rest on the basis that the false

---

**5.** The Board overruled *Hollywood Ceramics Co., supra*, in *Shopping Kart Food Market*, 228 N.L.R.B. 1311 (1977), but reinstated the *Holly-* *wood Ceramics* test in *General Knit of California*, 239 N.L.R.B. 619 (1978).

charge did not have a significant influence on the employees and, hence, on the election. The Board characterized the misrepresentation as "immaterial," reasoning that the allegation of bribery was wholly unrelated to wages and benefits or any other overriding issue in the campaign. "Rather, the thrust of the Union's statement [was] that the Company strongly opposed the Union and was willing to wage a vigorous campaign to keep the Union out, a fact presumably already known by the Company's employees." NLRB Brief at 16. We reject this view of the effects of the Union's charge. The Union charged that the Company had stooped to bribery in order to win the election. An employee undecided about Union representation who believed the charge to be true might well be indignant enough at this underhanded tactic to show his protest at the polls by voting for the Union. He might feel a greater need for a union to protect him against his unscrupulous employer. Furthermore, the entire credibility of the Company's campaign might be undermined by the implication that a Company supporter had been bribed. Thus, the fourth factor of the *Hollywood Ceramics* test is satisfied and, assuming that the charge was false, the election would have to be set aside. We shall discuss our disposition of the petition following our review of the Company's claim that the Board improperly refused to direct an evidentiary hearing into whether the Union offered financial and job-related inducements to eligible employees.[6]

### B. *Improper Inducements*

The Company offered evidence tending to show that the Union promised to obtain employment at Miller for Larry Darling, a current Company employee, if Darling supported the Union and the Union prevailed in the election; that the Union helped Company employees to obtain Miller employment application forms; and that a speaker at a Union meeting created the impression that the Union had helped him obtain employment at Miller. From the record, it appears that the Company's employees might have believed that the Union, which represented Miller's employees, was able to exert a significant influence over Miller's hiring decisions.

The Company was entitled to a hearing if its evidence demonstrated that there was a substantial and material factual issue which, if resolved in its favor, would require the setting aside of the representation election. *NLRB v. Bristol Spring Manufacturing Co.*, supra, 579 F.2d at 706–07. We conclude that the Company's allegations, if true, required the Board to set aside the election. In *NLRB v. Madisonville Concrete Co.*, 552 F.2d 168 (6th Cir. 1977), an election was set aside when the Union paid the fine and attorney's fees of an employee who received a $5 traffic ticket. And in *NLRB v. Bristol Spring Manufacturing Co.*, supra, this court indicated that it would have set aside an election if the Union had improperly made payments of $5 and $20 to several employees. The alleged misconduct by the Union here is far more serious than in the above instances where petty sums of cash were at stake and the Union did not explicitly condition its beneficence on the employee's support in the election. Here the Union is charged with promising to obtain improved employment for an employee on the express conditions that he support the Union in the campaign and that the Union prevail in the election. Since the Union would have lost the election had a single pro-Union voter changed his mind and his vote, a tainted Darling vote for the Union would be sufficient by itself to change the result of the election. The effects of the alleged misconduct, however, might be far more broad than this. The plant was abuzz with rumors about the Union's offer to Darling. Furthermore, employees who attended a Union organizational meeting thought that the speaker implied that he got his job at Miller with the help of the Union. The Company's

---

6. Because the Company did not press in this proceeding its objections to the Board's handling of the alleged misrepresentations in Para-graphs B, D, and E of "Ask Yourselves Why," it is unnecessary for us to review them.

employees could reasonably have concluded that their support of the Union would help them obtain more attractive employment at Miller whereas their support of the Company would hurt their chances of ever obtaining employment at Miller. Thus, the Company's allegations, if true, required the election to be set aside and the Company was entitled to a hearing if it demonstrated, by prima facie evidence, the existence of substantial and material factual issues supporting its allegations.

Our review of the affidavits in the record [7] reveals the following evidence tending to support the Company's allegations. One affiant stated that when he asked Darling if "he had gotten the union involved at Nixon because the union had promised him a job at Miller Brewing in return," Darling indicated that this was true, and that only later in the campaign did Darling deny it. Another affiant claimed that Darling said that he was "quite confident of obtaining a job at Miller because he had the number one and number two men from the Union to get him in." Rumors that the Union had promised Darling a job were all over the shop and several affiants stated that Darling obtained Miller employment application forms for them through his Union connections. One affiant wrote that she had tried, without success, to obtain a Miller employment application form for three or four months, but that Darling obtained one for her the day after she told him about her problem. He told her that "he had gotten both his job and my application through union officials at Miller Brewing." Several affiants stated that the speaker at a Union organizational meeting attended by about seventeen employees gave the impression that he had received a job at Miller through the Union.

Despite this evidence strongly indicating that the Union offered improper induce-ments to eligible employees, the Board denied that the Company had raised substantial and material factual issues respecting the Union's conduct to warrant a hearing. Apparently, the Board reached this conclusion because the Company did not produce nonhearsay testimony directly showing that the Union had promised Darling a job at Miller, that the Union had intended to spread rumors that it could help employees obtain employment at Miller, or that the Union's speaker at the organizational meeting had intended to create the impression that the Union had helped him to obtain employment at Miller.

By taking this position, the Board placed far too high a burden on an employer who seeks a hearing to prove that improper inducements were offered by a union. First-hand testimony establishing that the Union intended the improper conduct could come only from Darling or Union officials. But it was impossible for the Company to obtain their testimony because without a hearing an employer must rely upon the voluntary cooperation of witnesses to develop its case, *see Johnnie's Poultry Co.*, 146 N.L.R.B. 770, 775 (1964). The Board wrongly penalized the Company for failing to produce evidence which at that point could have been discovered only through the voluntary cooperation of those whom the Company had charged with misconduct. "Given the very limited discovery permitted in cases of this type, it is only when parties are given an opportunity to introduce evidence and examine witnesses that improprieties in the conduct of an election may be revealed." *NLRB v. Bristol Spring Manufacturing Co.*, *supra*, 579 F.2d at 707; *Home Town Foods, Inc. v. NLRB*, 379 F.2d 241 (5th Cir. 1967). Thus, the Board's insistence upon a stronger showing of improper Union conduct was wholly unreasonable in this case. For the Board to hold, despite the Company's strong

---

**7.** The Board argues on technical procedural grounds that several of these affidavits were not part of the formal record in the initial proceeding before the Regional Director. NLRB Brief at 25 n.19. We do not attach significance to this alleged technical defect in the record. The Board's Field Examiner wit-nessed the depositions and, thus, we assume that the Regional Director considered them when he stated, "All evidence adduced during the investigation, including sworn statements of witnesses, documentary evidence, and the parties' statements of position, have been fully and carefully considered...." A. 11.

prima facie case, that there was not even a substantial and material factual issue respecting the Union's conduct, was an abuse of its discretion.

■ The Board's abuse of its discretion was exacerbated by the circumstances of this case. The election result was extremely close. We have previously admonished the Board that "[t]he need for a hearing is particularly acute when . . . an election is close, for in such a situation, 'even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election.'" *NLRB v. Bristol Spring Manufacturing Co., supra*, 579 F.2d at 707, quoting *Henderson Trumbull Supply Corp. v. NLRB, supra*, 501 F.2d at 1230. We conclude that the Board's failure to direct a hearing into the Company's objections to the Union's alleged misrepresentations and improper inducements was arbitrary and capricious. *See Ithaca College v. NLRB*, 623 F.2d 224, 229 (2d Cir. 1980).

The only question remaining is how we should dispose of this matter. Although we are empowered to remand the proceedings for a hearing, we are not required nor are we inclined to do so. We will grant the relief that furthers the equitable principles which govern judicial action. *Ithaca College v. NLRB, supra.* The Company urges us not to remand the proceedings. It points to the great expense and delay to which it has been needlessly subjected by the Board's refusal to order a hearing. The Company fears that the delay has decreased its prospects of prevailing at a hearing because witnesses' memories fade and some key witnesses may be unavailable. Other factors also encourage us to avoid any further delay in the disposition of this proceeding. The Union's election victory was very narrow, the labor force at the Company has undoubtedly changed since the election, and there is no way of knowing at this time if the Union enjoys a majority of support. In light of these factors, we conclude that a remand would be inappropriate. *See Ithaca College v. NLRB, supra*, 623 F.2d at 230; *NLRB v. Producers Cooperative Association*, 457 F.2d 1121, 1126–27 (10th Cir. 1972).

Accordingly, the Board's petition for enforcement is denied.