NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CONNECTICUT FOUNDRY
COMPANY, Respondent,

International Ladies' Garment Workers
Union, AFL–CIO, Intervenor.

No. 1005, Docket 81–4224.

United States Court of Appeals,
Second Circuit.

Argued May 17, 1982.

Decided July 14, 1982.

Thomas M. Cloherty, Hartford, Conn. (Leslie A. Margolin, Murtha, Cullina, Richter & Pinney, Hartford, Conn., of counsel), for respondent.

William M. Bernstein, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John G. Elligers, N. L. R. B., Washington, D. C., of counsel), for petitioner.

Albert L. Goldman, Boston, Mass. (Angoff, Goldman, Manning, Pyle & Wanger, Boston, Mass., Max Zimny, Gen. Counsel, I.L.G.W.U., New York City, of counsel), for intervenor.

Before MANSFIELD and MESKILL, Circuit Judges, and PRATT, Circuit Judge.*

MESKILL, Circuit Judge:

The National Labor Relations Board petitions for enforcement of an order issued on January 20, 1981 directing Connecticut Foundry Company (Company) to bargain with the International Ladies' Garment Workers Union, AFL–CIO (Union) as the certified bargaining representative of production and maintenance workers at the Company's Rocky Hill plant. The Company has responded with a plethora of objections involving the conduct of the certification election and challenges to the eligibility of many voters. We deny enforcement of the NLRB's order.

## BACKGROUND

The Connecticut Foundry Company, which is wholly owned by two brothers, Arthur and Franklin Enquist, has operated its plant in Rocky Hill since 1919. The Company employs mostly unskilled or semi-skilled workers at the plant, where it manu-

---

* When this appeal was heard, Judge Pratt was a United States District Judge for the Eastern District of New York, sitting by designation. He was inducted as a judge of this Court on June 29, 1982.

factures grey iron castings.[1] Almost one-third of the production and maintenance workers who comprised the bargaining unit could not read English, and many more possessed low reading levels. J.App. at 531.

The genesis of this dispute lies in late 1977 when the Union conducted an organizing campaign at the plant. The Union called a recognitional strike on November 11 and filed a certification petition with the Regional Director four days later. The picketing, which spanned half a year, was highlighted by violence and threats which received widespread publicity in Connecticut, J.App. at 752–70.[2] Although the Company obtained injunctive relief from the Connecticut Superior Court regulating the number, location and activity of the pickets, unruly incidents continued. The Company also filed unfair labor practice charges against the Union,[3] which led to the is-

suance of a complaint by the Regional Director, J.App. at 771–76, 779–80, and a formal settlement on April 11, 1978, J.App. at 733–37.[4] Hampered by the strike, the Company elected to close the plant from November 20, 1977 until January 20, 1978, maintaining only a skeleton crew of maintenance employees. When the plant re-opened, the Company recalled most of the laid-off employees, excluding a few who it felt were responsible for picket line violence.[5] The response to the recall was apparently adequate to allow the plant to resume operations at least on a modified basis.

On May 19, 1978, the Regional Director issued a decision directing that an election be held, J. App. at 440. The election, which was scheduled on an expedited basis at the Company's request,[6] was held on June 16.

1. The Company admits that it is an employer engaged in commerce within the meaning of section 2(2), (6)(a) and (7) of the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. (1976) (Act). There is also no dispute that the Union is a labor organization within the meaning of section 2(5) of the Act.

2. The record is replete with testimony describing conduct which occurred on the picket line as well as away from the plant. In addition to threats to workers who crossed the line, J.App. at 351–54, typical incidents included slashed tires, J.App. at 354, broken windshields, J.App. at 258–59, and blocked cars, J.App. at 249–51, 370–71.

 At one point the Company chartered a bus to bring workers safely past the picket line. However, the bus sustained eighteen smashed windows, two flat tires and a disfigured radiator, J.App. at 254. The bus company refused thereafter to supply transportation. In addition, a van which the Company used to transport workers was riddled with bullets, J.App. at 266·68.

 While local police were stationed at the plant and escorted trucks making deliveries to the plant, they were unable to guarantee the workers' safety despite making many arrests, J.App. at 283–300.

3. The Company initially filed two complaints, the first on November 16, 1977 and a second on January 6, 1978. Case Nos. 1–CB–3928, 1–CB–3979. The Regional Director issued a consolidated complaint on January 31, 1978 alleging that the Union had committed 35 acts of intimidation and coercion against the Company's employees. A third complaint filed by the Compa-

ny was dismissed by the Regional Director. J.App. at 629.

4. The settlement was approved by the NLRB on May 16, 1978, J.App. at 535, and was later enforced by this Court, NLRB v. International Ladies' Garment Workers' Union, No. 78–4143 (Sept. 27, 1978). The settlement provided for a sixty-day period during which notices were to be posted in English, Spanish and Italian. While much of the violence and intimidation subsided, the record indicates that several incidents did occur even after the settlement.

5. Included in the recall were eighteen workers who were laid off on November 8, 1977. The apparent cause for their layoff at that time was the Company's loss of a major customer which had accounted for 20% of its business. See J.App. at 238.

6. As a condition to holding an early election, the Company signed a document which states:
 The Connecticut Foundry Company hereby agrees as follows:
 1) The compliance period in Case Nos. 1–CB–3928 and 3979 has commenced and the Charged Party has taken all action required by the formal settlement agreement except that the full period for posting the required notices has not yet passed.
 2) The unremedied unfair labor practices referred to in the posted notice may not constitute grounds upon which the Board may set aside the election in Case No. 1–RC–15,–464.
 J.App. at 742.

The number of voters who appeared at the three sessions that day was far in excess of the Company's normal work force.[7] As a result, the preliminary election result was as follows:

| | |
|---|---:|
| Votes cast for Union | 43 |
| Votes cast against | 75 |
| Challenged ballots | 94 |
| Total ballots | 212 |
| Void ballots | 1 |

J. App. at 454. In addition to the disputed eligibility of a large number of voters, several incidents cast a shadow on the propriety of the election. One involved three brief instances during which the Union allegedly violated an agreement that neither its nor the Company's representatives would enter within 150 feet of the polling area. A second incident involved a Union observer who displayed a drawing depicting a "skull and crossbones" to several persons waiting in line to vote. The Company also questioned the effect on the election of certain cash payments by the Union to strikers.[8]

Following an investigation but without a hearing, the Regional Director declared four of the ninety-four challenged ballots void, sustained six challenges, concluded that seventy-eight should be opened and counted, and ordered that a hearing be held on the six remaining ballots if no majority were otherwise achieved at that point. In addition, the Director dismissed all but two of the Company's and one of the Union's objections without a hearing. J. App. at 461–90. The NLRB sustained the Regional Director's disposition in large part, although it ordered a hearing on two additional challenges and one objection. The ballots ordered opened by the Director were

insufficient to establish a winner, and accordingly, the case proceeded before an Administrative Law Judge (ALJ) for resolution of the eight challenges and four objections.

The ALJ issued his decision on October 19, 1979, dismissing the Company's remaining objections and sustaining challenges to six ballots.[9] J. App. at 626–48. On February 29, 1980, the NLRB issued its decision affirming the ALJ's determination on all but two ballots, which it chose not to resolve. The final tally was as follows:[10]

| | |
|---|---:|
| Votes for the Union | 100 |
| Votes against | 95 |
| Challenged ballots to be opened if necessary | 2 |
| No determination made | 2 |
| Total of valid ballots | 199 |
| Challenges sustained | 2 |
| Ballots voided | 4 |

Accordingly, the NLRB certified the Union pursuant to section 9(a) of the Act. *Connecticut Foundry Co.*, 247 N.L.R.B. 1514 (1980).

Believing that its objections and challenges were justified, the Company chose not to honor the certification. On March 21, 1980, the Union filed a complaint alleging that the Company was in violation of sections 8(a)(5) and (1) of the Act for refusing to bargain. The NLRB found that the Company's arguments had all been resolved during the certification proceeding and therefore granted summary judgment in favor of the Union and issued a bargaining order on January 26, 1981. 254 N.L. R.B. No. 89 (Jan. 26, 1981), J. App. at 718–32. This case involves the NLRB's petition for enforcement of that order.

---

7. The record indicates that the normal work force was approximately 150. J.App. at 628–29. Over 200 voters cast ballots during the June 16, 1978 election.

8. In all, the Company filed 11 objections to the election. J.App. at 455–57. We outline only those that the Company has pursued before this Court.

9. The ALJ also determined that the Company had violated section 8(a)(1) of the Act by granting a wage increase to employees in April 1978. The Company has apparently complied with

the NLRB's remedy, and this matter is therefore not at issue in this proceeding.

10. We observe that there is an apparent discrepancy between the number of valid ballots as counted by the NLRB's final tally does not include those ballots to which challenges were sustained by the Regional Director and by the NLRB without a hearing. In any event, the parties are not in dispute concerning the tally as presented here, and the minor discrepancy, if one does indeed exist, would have no bearing on our decision.

## DISCUSSION

The Company raises three categories of challenges to the certification election. The first involves four irregular ballots declared void by the NLRB. The second consists of challenges to the eligibility of roughly one-fourth of the voters. The third concerns Union conduct which allegedly impinged upon the voters' freedom of choice.

### I. *Irregular Ballots*

The Company asserts that the NLRB patently ignored settled law in declaring four irregular ballots void. One of the ballots was left blank on its face, but had "no" written twice on the reverse side, J. App. at 712–13. A second voter had also left the face of his ballot blank, but wrote "non" on the reverse side, J. App. at 714–15. A third ballot had "no" written in both the "yes" and "no" boxes, J. App. at 717. The fourth ballot, which we attach as an appendix, had apparently been held upside down by the voter; the ballot had been marked in the "yes" box and had the word "no" written upside down above the box. The NLRB held that each of these ballots failed to indicate the voter's intent.[11]

 In light of the NLRB's recent decision in *Hydro Conduit Corp.*, 260 N.L.R.B. No. 168 (Mar. 31, 1982), as well as the abundant and uniform case law on irregular ballots, *see, e.g., NLRB v. Wrape Forest Industries, Inc.*, 596 F.2d 817 (8th Cir. 1979) (*en banc*); *Mycalex Division of Spaulding Fibre Co. v. NLRB*, 481 F.2d 1044 (2d Cir. 1973) (per curiam); *NLRB v. Tobacco Processors, Inc.*, 456 F.2d 248 (4th Cir. 1972); *NLRB v. Titche-Goettinger Co.*, 433 F.2d 1045 (5th Cir. 1970), we see no reason to discuss this matter in great detail. The general rule is that a ballot should be counted "if there is a clear expression of preference, regardless of the irregularity of the mark on the ballot." *NLRB v. Wrape Forest*, 596 F.2d at 819. We hold that the two

ballots left blank on their faces but marked on the reverse sides unequivocally indicated the voters' intent to vote against the Union. In addition, our own decision in *Mycalex* is sufficient to dispose of the third ballot, on which the voter wrote "no" in both the "yes" and "no" boxes. In that case, we held that a ballot containing the word "no" written in the "yes" box was sufficient to indicate the voter's intent to vote against the union. 481 F.2d at 1045. We believe it *a fortiori* that a ballot marked "no" in both boxes indicates intent to vote against the union.

Our conclusion concerning the intent of these voters is buttressed by considering the context of the election. As we stated in *Mycalex,*

> Only one question was presented on the ballot—whether the voter wished to be represented by the union. In such a situation, the word "No" whether in the "Yes" column or on the reverse side of the ballot expresses a clear preference on the part of the voter.

481 F.2d at 1045. Similarly, the sole question presented to voters in this certification election was whether they wished to be represented by the Union. Viewed in this light, the intent manifested in each of these three ballots is beyond cavil, and the NLRB therefore abused its discretion in failing to count these ballots. We also observe that the need for sensitivity to irregularities in voting is particularly acute in cases such as this involving many workers who possess low reading abilities. *See Crucible Steel Co.*, 117 N.L.R.B. 1616, 1618 (1957).

We are unable to conclude with the same degree of certainty, however, that the fourth ballot indicates the voter's negative preference. While the Company argues that the voter merely held his ballot upside down, we cannot find that the NLRB

---

11. Shortly before oral argument, the NLRB informed this Court that it wished to reconsider its ruling on the four irregular ballots in light of its recent decision in *Hydro Conduit Corp.*, 260 N.L.R.B. No. 178 (Mar. 31, 1982), which dealt with the counting of irregular ballots. We denied the NLRB's motion to withdraw its certi-

fied list, however, because the four ballots, even if counted as "no" votes, would not necessarily be determinative of the election. Accordingly, we elected to resolve the other issues involved in this proceeding for reasons of judicial economy.

abused its discretion in concluding otherwise. At the very least, we would consider a remand proper to allow the Board to reconsider the fourth ballot in light of *Hydro Conduit.*

Counting three of the four ballots as "no" votes would alone mandate a remand to allow the NLRB to address the two challenges it left unresolved. Nevertheless, we believe that the Board committed other errors in the course of its review and certification. Accordingly, we discuss the Company's remaining arguments below.[12]

## II. *Eligibility*

The Company reasserts a number of challenges to voters it presented unsuccessfully to the Board. In addition, the Company argues that the Board erred in sustaining the Union's challenge to the eligibility of two employees who are children of Company officials.

### a) *Workers Receiving Unemployment Benefits* :

■ In its challenges before the Regional Director, the Company questioned the eligibility of over thirty voters who were receiving Connecticut unemployment benefits at and prior to the time of the election. The Company pointed to section 236 of Connecticut's Unemployment Compensation Law, Conn.Gen.Stat. § 31–236 (1980), which allows payment of benefits to a person unemployed as a result of a labor dispute only upon a showing that "he is not participating in or financing or directly interested in the labor dispute which caused the unemployment." [13] Accordingly, the Company argued that if these workers were receiving benefits, they must have had no interest in

their jobs and were therefore improperly permitted to vote.

The Regional Director, without a hearing, ruled that the Company had failed to rebut the presumption of eligibility of these voters:

> The Employer provided no evidence that any of these employees affirmatively stated to the [Employment Security Division of the Connecticut Labor Department] that they had no interest in the labor dispute or in their struck jobs. Nevertheless, the Employer argues that because these strikers received unemployment compensation, they must have made such a statement. Even assuming that such statements were made, this fact standing alone or even in conjunction with the other facts disclosed during the investigation . . . is insufficient to rebut the presumption that these strikers did not abandon the strike or their interests in their struck jobs.

*J. App.* at 467. The Regional Director observed that the Connecticut Labor Department planned to reinterview these employees to determine whether their benefits should be revoked retroactively. *Id.* The Regional Director also noted that several of the employees at issue were employed in other jobs on the date of the election. *Id.* at 466. The Board affirmed.

The Company contends that, at the very least, the Board abused its discretion by failing to direct a hearing on this issue. We agree. As we recently summarized in *NLRB v. Lance Investigation Service, Inc.,* 680 F.2d 1 (2d Cir. 1982),

**12.** Counting three of the four voided ballots as "no" votes would create the following election result:

| | |
|---|---|
| Votes for the Union | 100 |
| Votes against | 98 |
| Challenged ballots to be opened if necessary | 2 |
| No determination made | 2 |
| Total of valid ballots | 202 |
| Challenges sustained | 2 |
| Ballots voided | 1 |

Were both the "challenged ballots to be opened if necessary" "yes" votes, there would still be

no need to resolve the two ballots on which the NLRB made no determination. Nevertheless, as we observed earlier, note 11, *supra,* we choose to address the Company's other arguments at this time for reasons of judicial economy.

**13.** As an alternative, a person applying for unemployment benefits may show that "his unemployment is due to the existence of a lockout." Conn.Gen.Stat. § 31–236 (1980). There is not allegation in this case that a lockout occurred.

A party is entitled to have a hearing only if it demonstrates by *prima facie* evidence the existence of " 'substantial and material factual issues' which, if resolved in its favor, would require the setting aside of the representation election." *NLRB v. Bristol Spring Manufacturing Co.*, 579 F.2d 704, 706–07 (2d Cir. 1978).

*Id.* at 2. We think that evidence of the receipt by these workers of unemployment benefits was alone sufficient to place at issue their interest in their jobs. We observe that while claimants need not file their applications for benefits under oath, they are nevertheless subject to criminal penalties for knowingly making false statements. Conn.Gen.Stat. § 31–273. The NLRB asserts that "[t]he Company's evidence may ... show that unemployment compensation was improperly paid, but it does not show that the striking employees abandoned interest in their jobs." Brief for NLRB at 32. The crux of the NLRB's position, therefore, is that workers may have made false statements in their applications for benefits despite the possibility of criminal penalties and that the Connecticut Department of Labor may have improperly approved benefits. We find these possibilities sufficiently disputable to conclude that a hearing was warranted.[14]

We are not persuaded by the Board's reliance on *Pacific Tile and Porcelain Co.*, 137 N.L.R.B. 1358 (1962), where striking employees who sought reinstatement from their employers solely to qualify for unemployment compensation were nevertheless held to have retained their status as economic strikers entitled to vote. *Pacific Tile* did not involve employees who arguably may have made affirmative misrepresentations to a state agency in violation of state law. A more difficult issue is the Director's reliance on unspecified documentation from the Employment Security Division purportedly showing that the state's policy was to deny unemployment compensation only to those who actually participate in *picketing*. If true, then under state policy *as administered* eligibility for unemployment compensation is not necessarily inconsistent with involvement in a labor dispute and continued interest in a former job. Nevertheless, a hearing was still warranted since the "documentation" relied upon, which appears clearly to contravene state law, was undescribed and unspecified.

### b) *Arthur Fredriksen* :

The Regional Director also rejected the Company's challenge to Arthur Fredriksen, a former worker who had been employed for approximately two and one-half months by another company prior to the election. The Director cited to a sworn statement signed by Fredriksen indicating that he would return to work "[i]f the conditions improve after the strike ends." In response, the Company presented an affidavit by a Company employee stating:

> At approximately noontime one day in the middle of May 1978, I spoke with Arthur Fredriksen at the CFC Parking lot. Fredriksen was driving a lumber truck from Rossi Lumber Company in Middletown. He had spoken to some picketers then drove over to where my car was parked in the lot. I asked Arthur if he was interested in returning to work. He said he was happy at that job in Middletown and wouldn't be interested in returning to CFC.

J.App. at 525. The Regional Director again held, without a hearing, that the Company had not rebutted the presumption that Fredriksen was eligible to vote in the election. J.App. at 465. The NLRB affirmed.

We believe that the Company was also entitled to a hearing on this issue. The Company's showing that Fredriksen had not appeared on the picket line, had indicated to a Company official that he had no desire to return, and had been employed for over two months at another company was certainly

---

**14.** It is also possible that workers initially applied for unemployment benefits intending wholeheartedly to abandon their jobs and then changed their minds. While this would support the Regional Director's determination, we consider the possibility that many workers had actually abandoned their jobs sufficiently plausible to conclude that a hearing was necessary.

sufficient to create a genuine and material issue of fact as to whether he had abandoned his job.[15]

c) *Felice Fonti* :

■ The Regional Director also declined to order a hearing on the eligibility of Felice Fonti, who had apparently applied for disability insurance benefits. J.App. at 469. The Company, after presenting only hearsay evidence to establish Fonti's application, argued that under the Social Security Act, 42 U.S.C. §§ 301 *et seq.*, the term "disability" is defined as

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. § 423(d)(1). Accordingly, the Company submitted that Fonti had indicated through his application for disability that he would not be returning to his job for at least twelve months and that he should have been declared ineligible as a result.

We are not prepared to hold that a hearing on Fonti's eligibility was warranted. Like the other voters, Fonti had signed a sworn statement indicating his intent to return to his job if the Union won the election or if the strike ended. We observe that unlike Fredriksen, Fonti did take part in picketing activity and was not employed elsewhere on the election date. In light of these factors, we believe that something

more than hearsay evidence concerning Fonti's mere application for disability benefits was required to create an issue of fact sufficient to require a hearing. Had the Company presented actual evidence of Fonti's disability or his receipt of disability benefits, our conclusion might be altered.[16]

The Company argues that under relevant Social Security Administration Regulations, 20 C.F.R. § 401.100 *et seq.*, its access to Fonti's application was restricted and that a hearing would have facilitated its ability to meet its burden of establishing Fonti's medical status through discovery. While we sympathize with the Company's predicament, we believe that the Company's burden was not to establish Fonti's actual medical status, but only to present some tangible evidence that he was suffering from a medical disability, *see* note 16, *supra*.[17] There was no abuse of discretion here.[18]

d) *Cornwall and Cox* :

■ The Company challenges the determination of the ALJ, which the NLRB sustained, that Elizabeth Cornwall and Jeffrey Cox, children of Company officials, were ineligible to vote in the certification election. Cornwall is the daughter of the plant manager, and Cox is the son of the plant engineer. We find that the Board's ruling is supported by substantial evidence in the record.

The Board has often excluded relatives of Company officials on a case-by-case basis because they "enjoy a 'special status,' such

---

15. We recognize that were this the Company's sole claim against enforcement, a hearing would not have been necessary because Fredriksen's ineligibility by itself would not have changed the election result.

16. For example, the Company presented evidence that various voters had *received* unemployment compensation. *See* Section IIa, *supra*.

17. We have been more sympathetic to a Company's need for the discovery afforded by a hearing where the only evidence that could substantiate the Company's allegations was in the hands of the Union or of those charged with misconduct. *See, e.g., NLRB v. Nixon Gear, Inc.,* 649 F.2d 906, 913 (2d Cir. 1981).

Here, the impediment on the Company's ability to assess Fonti's medical status derived from restrictions placed on access to files by Social Security regulations, and not from the Union's refusal to cooperate. We do not believe that the absence of discovery rendered the Company incapable of producing tangible evidence that Fonti was disabled or that he was receiving benefits.

18. We also find no merit in the Company's argument that Francisco Echevarria, another employee who was declared eligible by the Board, had been terminated prior to the election.

as privileges or favorable working conditions not granted other employees." *NLRB v. Caravelle Wood Products, Inc.*, 466 F.2d 675, 678 (7th Cir. 1972); *see Mercy Hospital v. NLRB*, 668 F.2d 661, 666 (2d Cir. 1982); *Linn Gear Co. v. NLRB*, 608 F.2d 791, 795 (9th Cir. 1979); *NLRB v. Caravelle Wood Products, Inc.*, 504 F.2d 1181, 1183–86 (7th Cir. 1974). The record contains ample evidence to support the Board's conclusion that Cornwall and Cox each occupied such a "special status." While the Company presented evidence that Cornwall and Cox were paid from regular payroll accounts and were not treated differently from other employees while on the job, both enjoyed considerable flexibility in scheduling their work hours around school and vacations, J.App. at 24–27, 53–54, and both intended to attend college shortly after the election, J.App. at 27, 41, 59. We cannot conclude that the Board erred in excluding these children of Company employees from voting in the certification election because they occupied a "special status."

### III. *Election Incidents*

The Company's final group of claims involve objections to Union conduct which allegedly "destroyed the 'laboratory conditions necessary for the conduct of a free and fair election.'" *NLRB v. Lance Investigation Service, Inc.*, 680 F.2d 1 at 1 (2d Cir. 1982) (quoting *NLRB v. Hale Manufacturing Co.*, 602 F.2d 244, 249 n.11 (2d Cir. 1979)). We consider each *seriatim*.

#### a) *Cash Payments*:

■ The Company questions the legitimacy of certain cash payments and provision of food by the Union to strikers prior to the election. The Regional Director declined to order a hearing, finding,

Where, as here, the benefits granted were less than what the strikers would have earned at work, and the employees involved have clearly demonstrated their commitment to the [Union], payment of striker benefits, distribution of turkeys, and occassionally [sic] providing breakfast or lunch did not impair the free choice of the voters. *Servomation of Columbus, Inc.*, 219 NLRB 504 and cases cited therein.

J.App. at 485. The Company contends that the Regional Director and the Board erred in failing to grant a hearing to determine the extent and nature of the cash payments. Importantly, the Company submits that the Director ignored evidence that the payments to some strikers may have exceeded their normal wages.

We have previously expressed our sensitivity to allegations of improper pre-election cash payments by the Union to employees. *NLRB v. Nixon Gear, Inc.*, 649 F.2d 906, 912–13 (2d Cir. 1981); *NLRB v. Bristol Spring Manufacturing Co.*, 579 F.2d 704, 706–07 (2d Cir. 1978). In particular, we have stressed the need for a hearing in such cases in order to afford the Company the right to discover evidence exclusively within the control of the Union. As we stated in *Nixon Gear* in holding that the NLRB abused its discretion in declining to grant a hearing despite a number of affidavits tending to support the Company's allegations of improper payments:

The Board wrongly penalized the Company for failing to produce evidence which at that point could have been discovered only through the voluntary cooperation of those whom the Company had charged with misconduct.

649 F.2d at 913. This is not to say that a hearing is always warranted when allegations of improper payments are made. The Company must still produce sufficient evidence, in the form of affidavits or otherwise, to satisfy its burden of establishing a *prima facie* case. Still, we emphasize that in determining whether the Company has met its burden, the NLRB must take into account the Company's access to information and evidence in the absence of discovery.

We find that the Company produced sufficient evidence of possible improprieties in the Union's payments in the present case to have warranted a hearing. The Company

submitted a number of affidavits substantiating its claims. J.App. at 553–59. In one, a Company employee attested that he observed certain cash distributions to strikers which were in addition to the usual payments made on each Friday during the strike. J.App. at 553. Another affidavit indicated that the Union may have made payments to non-strikers. J.App. at 556. Further, as in *Nixon Gear*, 649 F.2d at 914, the circumstances of the close election increased the need for a hearing. In short, we hold that the NLRB abused its discretion by failing to hold a hearing on this issue.

b) *Intrusions into the Polling Area* :

The Company charges that despite an agreement that no persons other than voters and observers would enter within 150 feet of the polling area, Union representatives did so on three occasions. Our review of the record indicates that the three instances were of extremely brief duration. Further, the Company presented no evidence that the Union representatives initiated contact with any voters. Accordingly, we find no basis for concluding that these technical infractions interfered in any manner with the election.

c) *Skull and Crossbones* :

 The Company's final objection to the election involves a Union observer's display of a drawing containing a "skull and crossbones" to voters waiting in line to cast their ballots. Several voters testified before the ALJ that they saw the drawing. J.App. at 215–17, 818. The record also indicates that

at least one voter who observed the drawing described it immediately thereafter to other workers upon returning to her workplace. J.App. at 801, 805.[19] Despite the closeness of the election, the ALJ called the incident "too trivial to warrant the setting aside of the election." J.App. at 644. The NLRB sustained the ALJ's determination.

We believe that this incident was not as "trivial" as the NLRB and the ALJ assert. The NLRB argues that "the conduct of rank and file employees is given less weight than conduct of union or employer officials in determining whether an election should stand." Brief for NLRB at 12. However, as we have recognized on other occasions, "[w]here, as here, an election is extremely close, even minor misconduct cannot be summarily excused on the ground that it could not have influenced the election." *Henderson Trumbull Supply Corp. v. NLRB*, 501 F.2d 1224, 1230 (2d Cir. 1974). The NLRB also submits that "where employees work in a rough physical environment, the coercive impact of superficially threatening horseplay must be correspondingly discounted." Brief for NLRB at 13. We are not as easily convinced as the NLRB that the display of the skull and crossbones amounted only to "horseplay," especially in light of the threats and violence which pervaded much of the six months immediately preceding the election, *see* note 2, *supra*.[20]

The NLRB erred in not giving appropriate weight to this evidence. However, in light of our disposition, we make no comment on whether this incident by itself might warrant the invalidation of an election.[21]

---

**19.** It is unclear from the record whether workers who had yet to vote were told of the incident. We observe that some portions of the testimony before the Administrative Law Judge relevant to this issue were stricken on grounds of hearsay.

**20.** The NLRB also submits that because the drawing also depicted a bottle of poison, it was meant to indicate only that the Union observer considered a voter who had crossed the picket line " 'poison' in the sense of 'something that

interferes with, or blights the progress, activity, or welfare of something else.' " Brief for NLRB at 14. We do not consider this argument worthy of a response.

**21.** We also make no comment on the Company's argument that the Board was obliged to consider the voters' subjective reactions to the drawing under *Henderson Trumbull Supply Corp. v. NLRB*, 501 F.2d 1224 (2d Cir. 1974).

### IV. *Disposition*

Although we would normally consider a remand proper for hearings on those issues we have specified, we are not inclined to do so in this instance. As we noted in *Nixon Gear*, 649 F.2d at 914, "[w]e will grant the relief that furthers the equitable principles which govern judicial action." We find the reasoning which led us to dismiss the NLRB's petition in that case equally compelling here:

> The Company urges us not to remand the proceedings. It points to the great expense and delay to which it has been needlessly subjected by the Board's refusal to order a hearing. The Company fears that the delay has decreased its prospects of prevailing at a hearing because witnesses' memories fade and some key witnesses may be unavailable. Other factors also encourage us to avoid any further delay in the disposition of this proceeding. The Union's election victory was very narrow, the labor force at the Company has undoubtedly changed since the election, and there is no way of knowing at this time if the Union enjoys a majority of support. In light of these factors, we conclude that a remand would be inappropriate.

*Id.* Similarly, a good deal of time—roughly four years—has passed since the election in this case was held. The NLRB's failure to order hearings on the issues we have specified renders the Company's burden on those issues much more difficult if not insurmountable. Additionally, we too have no way of knowing whether the Union still enjoys a majority of support. And, to the extent that the Company were to succeed on its claims, the Union might well choose to challenge the NLRB's new determinations.

Accordingly, we deny the NLRB's petition for enforcement of its bargaining order.

882

## APPENDIX

UNITED STATES OF AMERICA
STATI UNITI D'AMERICA
ESTADOS UNIDOS DE AMERICA

NATIONAL LABOR RELATIONS BOARD
CONSIGLIO NAZIONALE DEL LABORO
JUNTA NACIONAL DE RELACIONES DEL TRABAJO ·

OFFICIAL SECRET BALLOT FOR CERTAIN EMPLOYEES OF
SCRUTINIO SEGRETO UFFICIALE PER ALCUNI IMPIEGATI DELLA S. PETT. DITTA
PAPELETA SECRETA OFICIAL PARA CIERTOS EMPLEADOS DE

### THE CONNECTICUT FOUNDRY COMPANY
Rocky Hill, Connecticut

---

Do you wish to be represented for purposes of collective bargaining by—
Volete essere representati per il motivo di contrattore colletivamente da—
Desea usted estar representado para los fines de negociar colectivamente por—

INTERNATIONAL LADIES' GARMENT WORKERS, AFL-CIO?

---

MARK AN "X" IN THE SQUARE OF YOUR CHOICE
MARCATE CON UNA "X" NEL QUADRO DI VOSTRA SCELTA
MARQUESE CON UNA "X" DENTRO DEL CUADRO DE SU SELECCION

| YES | | NO | |
| SI | ☒ | NO | ☐ |
| SI | | NO | |

DO NOT SIGN THIS BALLOT. Fold and drop in ballot box. If you spoil this ballot return it to the Board Agent for a new one.
NON FIRMARE QUESTA SCHEDA. Piegatela e depositatela nell'urna elettorale. In caso di errore riportate questa scheda all agente del seggio e prendetene una nuova.
NO FIRME ESTA PAPELETA. Doblela y depositela en la urna electoral. Si usted dana esta papeleta devuelvala al Agente de la Junta y pidale una nueva.

ATTACHMENT C