**MOSEY MANUFACTURING COMPANY, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1668.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 14, 1982.

Reargued Oct. 19, 1982.

Decided Feb. 18, 1983.

Leland B. Cross, Jr., Ice Miller, Donadio & Ryan, James S. Cunning, Indianapolis, Ind., for petitioner.

Peter Winkler, N.L.R.B., Elliott Moore, N.L.R.B., Washington, D.C., for respondent.

Before CUMMINGS, Chief Judge, PELL, BAUER, WOOD, CUDAHY, ESCHBACH, POSNER, and COFFEY, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

We ordered reargument of this case en banc before issuance of a panel opinion (see Circuit Rule 16(e)) in order to resolve a conflict among panels of this circuit over whether the proper standard of judicial review in cases involving the Labor Board's application of its election rules to particular facts is abuse of discretion or substantial evidence on the record as a whole.

On June 10, 1977, the carpenters' union was elected the collective bargaining representative for a unit of Mosey Manufacturing Company's workers. The election was decided by one vote. The company, alleging union misconduct in the election campaign, refused to bargain with the union. The union filed an unfair labor practice charge with the Board, a complaint was issued, and the Board issued an order finding that the company had committed an unfair labor practice and ordering it to bargain with the union.

Two months before the election the Board had held, in *Shopping Kart Food Market, Inc.*, 228 N.L.R.B. 1311 (1977), that it would no longer try to protect workers from misrepresentations made by either management or union in election campaigns, as it had done during the regime of *Hollywood Ceramics Co.*, 140 N.L.R.B. 221 (1962). In presenting its case to the Board, Mosey emphasized the union's alleged threats of physical violence during the campaign, because this was a good ground under *Shopping Kart* for setting aside the election, but it also tried to show that the

union had misrepresented a wage increase which it had gotten for workers at another plant.

In April 1978 the Board applied to this court for enforcement of its order against Mosey. Shortly before oral argument, the Board decided *General Knit of California, Inc.,* 239 N.L.R.B. 619 (1978), in which it overruled *Shopping Kart* and reinstated *Hollywood Ceramics,* but without saying whether it meant the new rule to apply to pending cases. Although the Board's counsel urged this court to apply *Hollywood Ceramics* to this case, see *NLRB v. Mosey Mfg. Co.,* 595 F.2d 375, 377 (7th Cir.1979), we instead remanded the case to the Board, and "express[ed] no view on the merits of any objection to the election." *Id.* at 375 n. 2.

On remand the administrative law judge found that the union had made a material misrepresentation which in light of the close vote made the election invalid. The Board reversed. It found there had been no misrepresentation and in any event it had not been material. The Board reinstated the bargaining order and again applied to this court for enforcement. After the oral argument, but before the panel handed down a decision, the Board decided *Midland Nat'l Life Ins. Co.,* 263 N.L.R.B. No. 24, 110 L.R.R.M. 1489 (Aug. 4, 1982), which overruled *General Knit* and reinstated *Shopping Kart.* The Board stated that the new rule applied "to all pending cases in whatever stage." 263 N.L.R.B. No. 24 at p. 21 n. 24, 110 L.R.R.M. at 1494 n. 24.

■ The Board's counsel urges us to enforce the Board's order on the basis of the *Shopping Kart* standard. We could not do this even if we were certain that the Board wanted that standard applied to this case. Mosey has never had judicial review of the Board's original order, which was based on the *Shopping Kart* standard. In this (the second) round of review proceedings, the parties, unaware of the extent of the Board's fickleness, thought the applicable standard would continue to be that of *Hollywood Ceramics* and did not brief or argue the case under *Shopping Kart.* The compa-

ny's brief does mention the threats of physical violence that were the focus of its complaint when *Shopping Kart* was the ruling standard, but pushes them to the periphery of its argument; the core is misrepresentation. To decide this case under *Shopping Kart* we would have to dredge up the briefs that the parties filed in this court in 1978 or, more appropriately in view of the lapse of time, allow the parties to rebrief and reargue the issue.

But even this would not be good enough if it turned out that the company, while not entitled to relief under *Shopping Kart,* was entitled to relief under *Hollywood Ceramics.* True, the Board has *said* it will apply its new rule—the resurrected *Shopping Kart* rule—to all pending cases, and this is a pending case; and we may assume, as no contrary argument is made, that the Board has the broadest power to make rules for election disputes, to change those rules, to apply a changed rule retroactively, and to do all this in adjudicative decisions rather than in formal rulemaking proceedings. But cf. *NLRB v. Majestic Weaving Co.,* 355 F.2d 854, 859–62 (2d Cir.1966). The present case is so unusual, however, that we cannot be sure it was in the Board's contemplation when the Board announced in a footnote that the new rule would apply to all pending cases. More than five years have passed since the union won the election by one vote. No one knows whether the carpenters' union is still preferred by a majority of the bargaining unit—it may be, but equally it may not be. In addition, by twice during this proceeding changing its mind as to the applicable standard the Board has put Mosey through the hoops, subjecting it to protracted legal expense and uncertainty (though at the same time, it must be admitted, allowing the company to stave off the evil day when it must bargain with the union). We cannot be certain that if this case is remanded the Board will apply *Shopping Kart* and order the company to bargain with a union that won an election by one vote, perhaps procured through misrepresentations, many years ago.

In these circumstances, unless we can properly enforce the Board's order without a remand, we shall deny enforcement outright. In asking us to enforce its order the Board is appealing to our equitable powers, cf. *NLRB v. Apico Inns of California, Inc.,* 512 F.2d 1171, 1175 (9th Cir.1975), and we must ask what equity the Board would have if, after again ordering the company to bargain with the union, it came back to us asking for enforcement of its order. The election would still have been won by only one vote, but not five years ago, rather six or seven, the whole interval due mainly to the Board's inability to decide what standard to use in policing elections—it has changed its collective mind three times in the last five and a half years. When a party asking a court to do equity has strung out the proceeding to the point where the court cannot determine whether equitable relief would achieve the legitimate purposes of the suit, which in this case is to give a unit of Mosey's workers the collective bargaining representative of their choice, the court will withhold its assistance. See, e.g., *NLRB v. Nixon Gear, Inc.,* 649 F.2d 906, 914 (2d Cir.1981); cf. *NLRB v. Majestic Weaving Co., supra,* 355 F.2d at 86. The best protection for these workers' freedom of choice would be a prompt new election, which a remand will not accomplish.

A shorter Board-caused delay in an election that was not nearly so close persuaded the Second Circuit recently to deny enforcement of the Board's bargaining order outright rather than to remand, *NLRB v. Connecticut Foundry Co.,* 688 F.2d 871, 881 (2d Cir.1982), and the present case is an even stronger one for outright denial—provided Mosey has a winning case under *Hollywood Ceramics.* If it does not it has no basis for resisting enforcement. The only issue Mosey asked us to decide in this round of judicial review was whether the election should be set aside under the *Hollywood Ceramics* standard. So long as that standard seemed to be the law—so long as it was applied to this case—the company was content to proceed under it and not try to make out a case under *Shopping Kart.* If Mosey has no case under *Hollywood Ceram-*

*ics,* it cannot complain if we order enforcement. So we must decide whether the Board's order is valid under *Hollywood Ceramics.*

A week before the election the union told Mosey's workers that it could get them a 10 percent raise because it had gotten such a raise for workers at another plant. It had not; the raise had only been 5 percent. The Board found, on the basis of an argument that its General Counsel had not thought worth making to the administrative law judge, that the raise was 10 percent if certain cost of living increases were included. Even so, the union's failure to explain this qualification was misleading; it allowed Mosey's workers to think that the union would get them 10 percent above whatever cost of living increases they could expect to receive anyway in a period of high inflation (as 1977 was)—and had received, before the union came on the scene. So there was misrepresentation, it concerned a matter of vital interest to workers ("Among the various types of campaign misrepresentations, the courts have been least tolerant of distortions involving wages," *Peerless of America, Inc. v. NLRB,* 576 F.2d 119, 124 (7th Cir.1978)), and it was made in the course of a closely fought campaign. It could have swayed a single vote and that was all that would have been necessary to change the outcome.

These facts persuaded the administrative law judge that the election should be set aside under *Hollywood Ceramics*; the Board's contrary conclusion is not, in our judgment, supported by substantial evidence on the record as a whole. But neither is it so egregious, so unreasonable, that it is an abuse of discretion—assuming that this is a distinct, and narrower, standard of review than substantial evidence. The assumption is necessary, since if the standards are the same the Board's order is invalid under either.

Abuse of discretion is the standard of review of findings in election cases in the First, Fourth, and Tenth Circuits, see *NLRB v. S. Prawer & Co.,* 584 F.2d 1099, 1101 (1st Cir.1978); *NLRB v. Fenway Cam-*

bridge Motor Hotel, 601 F.2d 33, 36 (1st Cir.1979); Schneider Mills, Inc. v. NLRB, 390 F.2d 375, 378 (4th Cir.1968); Kustom Electronics, Inc. v. NLRB, 590 F.2d 817, 822 (10th Cir.1978), though only the First Circuit has given reasons for its choice. The Third, Fifth, Sixth, and Ninth Circuits either use substantial evidence as the sole standard or treat "abuse of discretion" as synonymous in this context with "unsupported by substantial evidence." See Jamesway Corp. v. NLRB, 676 F.2d 63, 67–69 (3d Cir.1982); NLRB v. South Miss. Elec. Power Ass'n, 616 F.2d 837, 839 (5th Cir. 1980); Harlan # 4 Coal Co. v. NLRB, 490 F.2d 117, 120, 124–25 (6th Cir.1974); NLRB v. Big Three Industries, Inc., 602 F.2d 898, 901 (9th Cir.1979). The Second and Eighth Circuits are hard to "read" on the issue but seem to treat the two standards as interchangeable. See Bausch & Lomb Inc. v. NLRB, 451 F.2d 873, 876, 877 n. 6 (2d Cir. 1971); LaCrescent Constant Care Center, Inc. v. NLRB, 510 F.2d 1319, 1324 (8th Cir.1975); NLRB v. Target Stores, Inc., 547 F.2d 421, 424–25 (8th Cir.1977).

In this circuit, a number of decisions apply the abuse of discretion standard: Macomb Pottery Co. v. NLRB, 376 F.2d 450, 452 (7th Cir.1967); Follett Corp. v. NLRB, 397 F.2d 91, 94 (7th Cir.1968); NLRB v. Red Bird Foods, Inc., 399 F.2d 600, 602 (7th Cir.1968); Louis-Allis Co. v. NLRB, 463 F.2d 512, 519 (7th Cir.1972); NLRB v. Martz Chevrolet, Inc., 505 F.2d 968, 970 (7th Cir.1974); NLRB v. Southern Health Corp., 514 F.2d 1121, 1123–24 (7th Cir.1975). Others apply the substantial evidence standard (one is the previous panel decision in this case, and arguably therefore is the law of the case): Celanese Corp. of America v. NLRB, 291 F.2d 224, 225 (7th Cir.1961); NLRB v. Mosey Mfg. Co., supra, 595 F.2d at 377 n. 5; and Midwest Stock Exchange v. NLRB, 620 F.2d 629, 632 (7th Cir.1980). One equates the two standards: Peerless of America, Inc. v. NLRB, supra, 576 F.2d at 122. Although our most recent decision (Midwest) applied the substantial evidence standard, its persuasiveness is weakened by the fact that it does not mention the decisions in which other panels of the circuit

had taken a contrary approach; and a subsequent dictum in Advertisers Mfg. Co. v. NLRB, 677 F.2d 544, 546 (7th Cir.1982), revives "abuse of discretion."

■ Obviously the issue should not be settled by counting noses, even distinguished judicial ones. We have to take a fresh look at the issue and we begin by observing that the statute which governs judicial review of Labor Board orders, section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), states that the Board's findings of fact shall be conclusive provided they are "supported by substantial evidence on the record considered as a whole." There is no express exception for unfair labor practice cases growing out of representation elections and no obvious reason why the courts should imply one. The finding that a statement made in an election campaign was true, or substantially true, or if false immaterial is the kind of factfinding that normally is reviewed under the substantial evidence standard, whether in a securities case, see, e.g., TSC Industries v. Northway, Inc., 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976); Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1048 (7th Cir.1977); SEC v. Falstaff Brewing Corp., 629 F.2d 62, 76 (D.C. Cir.1980), or a Federal Trade Commission false-advertising case, see, e.g., Porter & Dietsch, Inc. v. FTC, 605 F.2d 294, 300 (7th Cir.1979); we cannot see why it should not be reviewed under the same standard in an election case.

It is true but irrelevant that direct judicial review of the Board's decision to certify a collective bargaining representative on the basis of an election is extremely limited. The purpose is to prevent delay, rather than to narrow the scope of judicial review of the decision in the event the employer refuses to bargain with the union and an unfair labor practice action is brought against him. See section 9(d) of the Act, 29 U.S.C. § 159(d); Boire v. Greyhound Corp., 376 U.S. 473, 477, 84 S.Ct. 894, 896–897, 11 L.Ed.2d 849 (1964).

It is also true, but again irrelevant, that the Board enjoys an unusually broad discretion in deciding what rules to apply to election campaigns. This is because the Board has founded its authority to issue such rules on two statutory provisions that contain no standards—the preamble to the Taft-Hartley Act, 29 U.S.C. § 141(b), and section 9(c) of the National Labor Relations Act, 29 U.S.C. § 159(c), which authorizes the Board to conduct representation elections. See *Hollywood Ceramics, supra,* 140 N.L.R.B. at 223 and n. 3; *Peerless Plywood Co.,* 107 N.L.R.B. 427, 429 (1953). That is why the Board can go from *Shopping Kart* to *Hollywood Ceramics* and back again without judicial interference. The courts that have applied an abuse of discretion standard to election disputes have done so precisely because the Board's authority to regulate elections is plenary, but in so doing have overlooked the difference between discretion in formulating rules and discretion in applying them to facts.

We may assume that the soundness of an election rule is not the business of the reviewing court. But it is its business to make sure that the rule is applied to the facts in a responsible fashion, and this traditionally has meant in accordance with the substantial evidence standard. It makes no difference whether the rule comes from Congress directly or through its delegate, the Board, indirectly. The Board does not have a broader discretion in devising election rules than Congress itself would have; yet even if the rule had come from Congress the substantial evidence standard would be used to determine whether the Board was applying the rule correctly. Judicial review should not be more limited just because the Board rather than Congress is the rulemaker.

■ Moreover, the abuse of discretion standard is out of place here. It is meant for the review of decisions that have one or more of the following characteristics: the factors that are supposed to dominate the decision cannot be evaluated by the reviewing court; the decision is supposed to be made on the basis of subjective rather than objective factors—the individual judgment of the judge or administrator, rather than some articulable legal standard; uniformity among decisions is not important. See *Noonan v. Cunard S.S. Co.,* 375 F.2d 69, 71 (2d Cir.1967). A decision applying a Board-created election rule to contested facts has none of these characteristics. If the rule forbids material misrepresentations, as the rule of *Hollywood Ceramics* does, then deciding whether a representation is false, and if so materially, requires the application of an objective standard (material falsehood) to evidence, rather than an exercise of discretion. The Board's determination of the appropriate bargaining unit illustrates discretionary judgment, see *Lammert Industries v. NLRB,* 578 F.2d 1223, 1225 (7th Cir.1978), as does its formulation of election rules. But the natural standard to use in evaluating the application of a rule to facts is substantial evidence.

■ The two Board findings challenged in this case—that the union's claim of what it had done for workers at another plant was not false, and that if it were false it would not be likely to sway the election— are factual in nature, and being unsupported by substantial evidence on the record as a whole are invalid. That means that if this case is governed by the *Hollywood Ceramics* standard, under which elections are set aside if there are material misrepresentations in the campaign, the Board's order must be set aside. *Midland* suggests that the Board probably, but not certainly, would apply the *Shopping Kart* standard to this case instead, because it is a pending case. Hence if there were no problem of Board-caused delay, we would not deny enforcement on the basis of *Hollywood Ceramics* but would remand the case for the Board to decide whether to apply its new standard. Since the long delay in this matter due to the Board's indecision has persuaded us that the case should not be remanded, that leaves us with no choice but

ENFORCEMENT DENIED.

HARLINGTON WOOD, Jr., Circuit Judge, concurring.

I fully concur in the denial of enforcement of the Board's order, but in the partic-

ular circumstances of this case, I come to that view more directly.

This story began back in 1977, over five years ago, when the disputed representation election was held. Mosey Mfg., a modest sized company, then had 72 production and maintenance employees eligible to vote. The union won by one vote, but the company refused to bargain because of various alleged deficiencies of the Board and union.

This case first came here for enforcement consideration in 1977, but we felt compelled to remand, observing that the applicable area of labor law was "recently subjected to great flux." *N.L.R.B. v. Mosey Mfg. Co., Inc.*, 595 F.2d 375, 376 (7th Cir.1979). That "great flux," it now appears, was not over.

From 1962 to 1977 the standard articulated in *Hollywood Ceramics Co.*[1] applied, but in April 1977 a Board majority in *Shopping Kart Food Market, Inc.*[2] overruled *Hollywood Ceramics,* and the "flux" began. *Shopping Kart* was in vogue at the time of the election, and remained so until after the Board's decision and order. Then in 1978, in *General Knit of California, Inc.,*[3] the Board deserted *Shopping Kart* and went back to *Hollywood Ceramics.* The briefs, in our first review of this case, argued *Shopping Kart,* but at oral argument the parties were arguing *Hollywood Ceramics.* This court declined to try to sort through it, and reasoned that it "would be incompatible with an orderly process of judicial review" for this court "to become embroiled in the shifting currents of the Board's efforts to settle upon its standards," labeling them as "on-again, off-again." 595 F.2d at 377.

The case therefore was sent back to the Board which in turn reinstated its bargaining order, and has now come back again to have this court enforce the order. So, this court heard oral argument again, but not long after that and before the matter could be decided, the Board, in *Midland Nat'l Life Ins. Co.,*[4] abandoned *General Knit* and took up again with *Shopping Kart.* So far as I

can tell that is where we are at the moment. "On-again, off-again" is apparently on-again. Against that confusing background of delay traceable to the bureaucratic oscillation of the Board I would separate this case from those with ordinary delays, draw the line, and deny enforcement relying on the precedent of practical common sense. I view whatever standard the Board claims today supports its order to be irrelevant in this case now.

Five years ago one employee of this company cast the deciding vote in the contested election. Who the employees of *Mosey Mfg.* may be today, or what their thoughts may be about their own representation, we have not the slightest idea. One way to find out, however, is to give the current employees the opportunity to have a new election, if they so choose, so that they may have some voice in their own futures. The circumstances of this case are reason enough, I believe, to cut through it all directly to that end. If any problems were to arise during a new election, those problems optimistically could be resolved on an expedited basis by the Board, and by this court if necessary.

The Board admittedly has the right to change its mind, but there must be a limit to the Board's right to impose the burdens of its own unstable expertise on others, employees, employers, and courts alike.

CUDAHY, Circuit Judge, dissenting.

I join fully in Judge Swygert's persuasive dissent. The majority has engaged in an extraordinary exercise of judicial activism in essentially substituting its judgment for that of the Board on what would sway a union election. I write separately to stress two points.

First, I see no reasonable basis for uncertainty about whether the Board would want the *Shopping Kart* standard and not the *Hollywood Ceramics* standard applied to

1. 140 N.L.R.B. 221 (1962).

2. 228 N.L.R.B. 1311 (1977).

3. 239 N.L.R.B. 619 (1978).

4. 263 N.L.R.B. No. 24, 110 L.R.R.M. 1489 (Aug. 4, 1982).

this case. In *Midland,* in addition to stating that *Shopping Kart* would apply "'to all pending cases in whatever stage,'" the Board stated that "failure to [apply *Shopping Kart*] would be contrary to the 'statutory design.' For ... we believe that, on balance, the *Hollywood Ceramics* rule operates more to frustrate than to further the fundamental statutory purpose of assuring employee free choice." *Midland National Life Insurance Co.,* 263 N.L.R.B. No. 24 at p. 21 n. 24, 110 L.R.R.M. 1489, 1494 n. 24 (1982) (citation omitted). In light of this language there is no need to remand.

Second, even if remand were necessary, I am not so certain as the majority apparently is that application of "equitable" principles should preclude such a remand. I *am* certain, however, that the equities are not one-sidedly in favor of the employer. Strikingly absent from the majority's discussion of equity is any recognition that denying enforcement of the bargaining order subjects the employees to further delays in effectuating their right to collective representation. The majority's assumption that "[t]he best protection for these workers' freedom of choice would be a prompt new election," *supra* at 613, ignores the fact that, notwithstanding the Board's changes in standards, the employer in this case was able to negate the employees' choice from June 10, 1977, the date of the election, until at least March 27, 1979, the date of our first review of this election, a review to which the employer is of course entitled.[1] I know of nothing to insure that the enjoyment of the fruits of a "prompt new election" will not also be delayed for up to two years.

In sum, I see nothing equitable about a result which, when all is said and done, results in these *employees* losing their statutory right to representation because the majority is annoyed at the "fickleness" of the *Board.* I think that such an outcome has no sanction in the Act or in the decided cases.

Therefore, I respectfully dissent.

SWYGERT, Senior Circuit Judge, with whom Circuit Judge CUDAHY joins, dissenting.

This case has been buffeted by the alternating tides of the National Labor Relations Board's decisions to invalidate labor elections during which last-minute, material, substantial misrepresentations are made, *see General Knit of California, Inc.,* 239 N.L.R.B. 619 (1978); *Hollywood Ceramics Co.,* 140 N.L.R.B. 220 (1962), or to ignore such misrepresentations in evaluating whether "laboratory conditions" have been spoiled, *see Midland National Life Insurance Co.,* 263 N.L.R.B. No. 24 (1982); *Shopping Kart Food Market, Inc.,* 228 N.L.R.B. 1311 (1977). The election at issue here took place under the reign of *Shopping Kart,* the standard the Board readopted in *Midland* and which is currently in effect. The Board has reviewed and upheld the election under both standards against claims that Board misconduct and union threats, misrepresentations, and improper promises of benefits spoiled the laboratory conditions. *See Mosey Manufacturing Co.,* 255 N.L.R.B. 552, 553 (1981) (upholding election under *Hollywood Ceramics* standard); *Mosey Manufacturing Co.,* 234 N.L.R.B. 908, 908 & n. 2 (1978) (upholding election under *Shopping Kart* standard); *Mosey Manufacturing Co.,* No. 25–RC–6619 (N.L.R.B. July 20, 1977)

1. The timetable was as follows:

| April 15, 1977 | Union representation petition filed. |
| June 10, 1977 | Election. |
| June 17, 1977 | Investigation of election in response to company objections. |
| July 20, 1977 | Regional Director's certification of Union. |
| September 22, 1977 | Board denial of review. |
| October 5, 1977 | Company's refusal to bargain. |
| November 15, 1977 | General Counsel's issuance of unfair labor practice complaint. |
| February 13, 1978 | Board's order to bargain. |
| April 25, 1978 | Board application for enforcement to Seventh Circuit. |
| March 27, 1979 | Seventh Circuit's remand. |

*See* Joint Appendix at 30–31.

(representation proceeding) (upholding election under *Shopping Kart*). It is an unfortunate coincidence that each time these decisions reached this court for review, the standard had shifted; nevertheless, it is clear that the Board views its certification as proper in any case. Our task is to review the propriety of that certification.

A majority of this court now holds that enforcement of the bargaining order must be denied, reasoning that because the result of our review would differ depending on which of the Board's two tests is applied, and because we do not know which test the Board would choose to apply in this case or how it would evaluate the company's non-misrepresentation objections, remand to the Board would be necessary; and that the resulting delay would so compound the existing delay from the date of the election that any future appeal to enforce would lack equity. This rationale rests on four premises: first, that the Board's decision to uphold the election under the *Hollywood Ceramics* standard is not supported by substantial evidence; second, that remand is necessary to determine whether the Board would apply *Midland* retroactively to this case; third, that remand is necessary to allow the Board to evaluate the company's other objections; and fourth, that lapse of time is a sufficient basis to deny enforcement of the bargaining order. Because I disagree with each of these premises, I respectfully dissent.

I

The Board's decision that the election was valid under the *Hollywood Ceramics* criteria is faultless. The majority properly identifies our standards of review: as in other contexts, Board rules must be upheld unless it was an abuse of discretion to adopt them, and adjudications applying those rules must be upheld if they are supported by substantial evidence. Having identified the standards, however, the majority fails to identify the Board rule in question precisely and fails to detail in what respect substantial evidence for its adjudicatory decision is lacking.

*Hollywood Ceramics* established, as the majority correctly notes, that laboratory conditions may be spoiled by material misrepresentations preceding an election. More particularly,

the Board has refused to certify election results where a party has misrepresented some material fact, within its special knowledge, so shortly before the election that the other party or parties do not have time to correct it, and the employees are not in a position to know the truth of the fact asserted.

*Hollywood Ceramics Co.*, 140 N.L.R.B. at 223. In reviewing the Board's application of these standards, a court is not free to interpret the rule as a statute (supplying its own interpretation of materiality, for instance), because the Board has refined the rule, supplying its own interpretation of the rule's elements, as it is entitled to do. *See Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. 404, 413, 417–18, 102 S.Ct. 720, 725, 727–728, 70 L.Ed.2d 656 (1982). These refinements are reviewable only for abuse of discretion. *Id.* The fact that these independent instances of "rulemaking" are conducted in the course of adjudicating particular cases blurs the line between rulemaking and adjudication. Judicial review would be simpler if these categories were more distinct, but we are bound by the Supreme Court's view that the Board may announce new standards in adjudications. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771–1772, 40 L.Ed.2d 134 (1974); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 767, 770–71, 89 S.Ct. 1426, 1430, 1432, 22 L.Ed.2d 709 (1969) (plurality opinions).

It is possible to construe the Board's decision to uphold the election in the present case as an interpretation of what kinds of misstatements would offend the general *Hollywood Ceramics* standard—in other words, a refinement of the general standard. Because the determination of disruption of laboratory conditions is so fact-dependent, *see General Knit of California, Inc.*, 239 N.L.R.B. at 622, it may be difficult to formulate comprehensive standards in

advance. In similar circumstances in *NLRB v. Bell Aerospace Co.*, 416 U.S. at 294, 94 S.Ct. at 1771–1772 (approving the Board's adjudicatory decision that a certain buyer was not a "managerial employee"), the Supreme Court noted that

> [i]t is doubtful whether any generalized standard could be framed which would have more than marginal utility. The Board thus has reason to proceed with caution, developing its standards in a case-by-case manner with attention to the specific character of the buyers' authority and duties in each company. The Board's judgment that adjudication best serves this purpose is entitled to great weight.

*See also NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265, 95 S.Ct. 959, 967, 43 L.Ed.2d 171 (1975) ("The use by an administrative agency of the evolutional process is particularly fitting."). Standards developed in this ongoing fashion are assailable only if they are arbitrary or contrary to law; a court may not substitute its judgment on debatable issues for the Board's. *See Charles D. Bonanno Linen Service, Inc. v. NLRB*, 454 U.S. at 413, 417–18, 102 S.Ct. at 727–728. The fact that the Board may sharply constrict its review of misrepresentations, *see Linn v. United Plant Guard Workers Local 114*, 383 U.S. 53, 60, 86 S.Ct. 657, 661–662, 15 L.Ed.2d 582 (1966), a power it has exercised to restrict still further the rule it announced in *Midland, see Affiliated Midwest Hospital, Inc.*, 264 N.L.R.B. No. 146, at 6 (1982) (Board now will intervene only when its own documents are misrepresented), demonstrates that it is debatable whether misrepresentations—either generally or in particular cases—undermine the legitimacy of elections. If the Board was pursuing this evolutionary standard-making process in its *Mosey* decision, 255 N.L.R.B. 552 (1981), therefore, we may review its order only for arbitrariness or abuse of discretion, a showing the majority has not made.

Even if we view the Board's decision as pure adjudication, with no element of rule-making, however, the majority's analysis is faulty, for it ignores past refinements and interpretations of the *Hollywood Ceramics* rule. It is against that body of rules, and not the bare statement quoted above, that we must measure the Board's decision.

From the time it formulated its material misrepresentation rule the Board emphasized that it would exercise its power to invalidate elections sparingly. In *Hollywood Ceramics* itself, the Board emphasized that elections "should not be lightly set aside," partly because of its respect for the integrity of the government-conducted, secret-ballot process, partly because it viewed repeated elections as harmful to labor relations, and partly because "absolute precision of statement and complete honesty are not always attainable in an election campaign, nor are they expected by the employees." 140 N.L.R.B. at 223. It concluded that elections should be invalidated only in cases of untruths so substantial yet so believable as to be likely to have affected the outcome:

> We believe that an election should be set aside only where there has been a misrepresentation or other similar campaign trickery, which involves a substantial departure from the truth, at a time which prevents the other party or parties from making an effective reply, so that the misrepresentation ... may reasonably be expected to have a significant impact on the election. However, the mere fact that a message is inartistically or vaguely worded and subject to different interpretations will not suffice to establish such misrepresentation as would lead us to set the election aside. Such ambiguities, like extravagant promises, derogatory statements about the other party, and minor distortions of some facts, frequently occur in communication between persons. But even where a misrepresentation is shown to have been substantial, the Board may still refuse to set aside the election if it finds upon consideration of all the circumstances that the statement would not be likely to have had a real impact on the election.

*Id.* at 224 (footnotes omitted).

In applying *Hollywood Ceramics* the Board occasionally felt compelled to remind

parties (and perhaps the regional directors) that its intervention would be extraordinary. *See Modine Manufacturing Co.,* 203 N.L.R.B. 527, 530 (1973), *enforced,* 500 F.2d 914 (8th Cir.1974):

> [W]e ought not be casual or overready to agree either that the secret ballot choice of a majority of the eligible voters, made under closely supervised balloting conditions, be disregarded or that it await finality while we undertake further administrative proceedings, and encourage further litigation. At least we must carefully weigh in the balance whether considerations of protecting the integrity of our elections are, under all of the circumstances, sufficiently significant to warrant a further expenditure of public funds, a further investment of the time of our personnel, and, as here, a delay in the commencement of collective bargaining on behalf of the employees by the agent they have selected. . . .
>
> . . . .
>
> . . . We have . . . , in entering this difficult area at all, exercised an abundance of administrative caution. In applying that abundance of caution, however, we believe we must again be cautious.
>
> . . . .
>
> . . . [O]ur experience has taught us how easy it is for an objecting party in any heated campaign to seize upon some sentence, or some paragraph, in the final propaganda effort by one of the participants and find therein a claimed departure from solid fact or objective truth, and demand that we hold a hearing as to its verity and as to the still more elusive issues of materiality to the voter's choice and its probable—or possible—impact on that choice.
>
> . . . .
>
> . . . [T]here must be a reasonably flexible and not too constrained or rigidly controlled area left for administrative expertise in determining, in the best judgment we can muster from our knowledge and experience in the field, and in the exercise of sound administrative discretion, what circumstances justify . . . invalidating an election . . . .

The difficulty of maintaining these limitations on intervention impelled the Board in *Shopping Kart* to curtail intervention almost completely. 228 N.L.R.B. at 1312–13; *id.* at 1314 (Chairman Murphy, concurring) (accepting the majority's view because *Hollywood Ceramics* had been expanded beyond the original intent to interfere only "in the most extreme situations"). It is true that the Board quickly forswore this hands-off policy, *see General Knit,* but only on condition that the readopted *Hollywood Ceramics* rule would be applied strictly. In restating the rule, the Board noted:

> The *Shopping Kart* majority clearly thought the *Hollywood Ceramics* rule failed to take . . . into account [employees' ability as mature adults to evaluate campaign rhetoric]. In this, they were in error. Rather, the principles of *Hollywood Ceramics* clearly recognize employee ability to assess the bulk of campaign propaganda. As can be discerned from the general principle in that decision, . . . the area of the Board's concern involving alleged misrepresentations is truly a circumscribed one.

*General Knit,* 239 N.L.R.B. at 620.

The Board's abstract formulations of its rule left no doubt that its scrutiny would be shallow. Its wavering between never upsetting elections and upsetting them in a limited class of cases, demonstrating its hesitancy to interfere at all, reinforces its assertions that successful *Hollywood Ceramics* challenges should be rare. The best indication of what the Board actually means by misrepresentations so substantial as to impair the validity of an election, however, is its practice in adjudicating particular cases. In many cases the Board has overruled objections to elections based on erroneous wage comparisons made by unions, employees, or employers, often rejecting the findings of the regional director or trial examiner, as it did in the present case. In *National Waterlift Co.,* 175 N.L.R.B. 849 (1969), for example, the objection concerned the employer's misrepresentations concerning the wages and benefits at competing

companies. Although the regional director had found the misrepresentations to be substantial, the Board refused to invalidate the election, which the union has lost, because it found the inaccuracies to be "at worst an imprecise expression not uncommon in campaign literature," recognizable as such by the employees. *Id.* at 850. Similarly, in *Russell-Newman Manufacturing Co.,* 158 N.L.R.B. 1260 (1966), the employer challenged an election won by the union because of campaign propaganda in which the union listed wage and benefit increases it had negotiated at other plants, but failed to note that the increases would take effect over a three-year period rather than all at once. The trial examiner found these misrepresentations substantial enough to invalidate the election. The Board rejected that finding, noting that under the *Hollywood Ceramics* rule "it would not set aside an election on the basis of propaganda where the message i[t] sought to convey was merely 'inartistically or vaguely worded and subject to different interpretations,'" and concluding "that the Union's propaganda ..., at worst, was an exaggeration of fact, subject to different interpretations, and as such would not constitute a sufficient basis for setting aside an election. Indeed, we note that a characterization of a three-step wage increase in terms of a total package is now a relatively common method of announcing such benefits ...." *Id.* at 1264. These cases indicate how narrowly the Board construed its substantial-misrepresentation rule.

Nor are these cases aberrations from the Board's usual practice. *See, e.g., National Medical Hospital,* 251 N.L.R.B. 842, 844 (1980) (wage comparison, used to show benefits of unionization, was not a material misrepresentation despite the fact that some of the competitors compared were nonunionized) (rejecting regional director's findings); *Beaird-Poulan Division, Emerson Electric Co.,* 247 N.L.R.B. 1365, 1383–85 (1980) (wage comparison was not misleading despite lack of comparability of job classifications), *enforced,* 649 F.2d 589 (8th Cir.1981); *Rex-Hide, Inc.,* 241 N.L.R.B. 1178, 1179 (1979) (misrepresentation of wage increases won by union at another company "constituted normal election propaganda which was not substantially or materially misleading"); *Miller's Pre-Pared Potato Co.,* 240 N.L.R.B. 1302, 1302–03 (1979) (wage comparison was not misleading despite lack of comparability of job classifications); *Conalco, Inc.,* 225 N.L.R.B. 879, 880 (1976) (erroneous wage comparison prepared by employees, used to show lack of benefit of unionization, was not a material misrepresentation) (rejecting regional director's findings); *Tri-Ex Tower Corp.,* 224 N.L.R.B. 680, 680 (1976) (employer's false statement that unionized employees had gained no benefits from strike was not a material misrepresentation) (rejecting regional director's findings); *Southern Health Corp.,* 201 N.L.R.B. 462, 465 (1973) (wage comparison was not misleading despite fact that negotiated wage increases could not be implemented because of government wage and price freeze), *enforced,* 514 F.2d 1121 (7th Cir.1975); *Southern Foods, Inc.,* 171 N.L.R.B. 999, 1000–01 (1968) (union's exaggeration of benefits won by competitor's unionized employees was not misleading "in view of the volume and nature of permissible propaganda utilized by both sides in [the] campaign," because employees would not credit the union's "self-serving, puffing statement") (rejecting regional director's findings), *enforcement denied,* 434 F.2d 717 (5th Cir.1970); *Follett Corp.,* 160 N.L.R.B. 506, 508–09 (1966) (misstatements in wage comparison were not substantial in context of entire campaign) (rejecting regional director's findings), *enforced,* 397 F.2d 91 (7th Cir.1968); *Excelsior Underwear Inc.,* 156 N.L.R.B. 1236, 1247 (1966) (misstatements in employer's campaign letters were not substantial because of partisan electioneering context) (rejecting regional director's findings).

The inaccuracies in *National Waterlift* and *Russell-Newman* are similar to those alleged in the present case. As in *Russell-Newman,* the Board in *Mosey,* 255 N.L.R.B. at 553, considered the inclusion in the stated pay increase of extra benefits (here, the cost-of-living increase; there, the future

base pay increases) not inaccurate. In both cases the statement in issue employed a common method of describing increases. As in *National Waterlift,* the Board in *Mosey, id.,* found any inaccuracies that did exist to be not misleading because of their context. In both cases the Board judged the employees capable of evaluating the statements as the kinds of exaggerations common to campaigns. Indeed, the statement in *Mosey* was even less likely to mislead because it was in response to the employer's deliberately provocative "put up or shut up checklist," * and because it guaranteed zealous support rather than a particular wage increase. *Cf. Archer Laundry Co.,* 150 N.L.R.B. 1427, 1435 (1965) (guarantee of support is permissible campaign propaganda). Both the tone and the context of the response made it unlikely, in the Board's view, to affect the election's outcome. In fact, the *Mosey* decision is stronger than *Russell-Newman* or *National Waterlift* because of its combination of their rationales: *Mosey* challenges both the alleged inaccuracy and its tendency to mislead. This conclusion comports with the Board's general view that most campaign rhetoric is capable of assessment by employees and is therefore not so deceptive as to invalidate an election. *See Melrose-Wakefield Hospital Association v. NLRB,* 615 F.2d 563, 567 (1st Cir.1980) ("The *Hollywood Ceramics* policy contemplates that only a narrow range of campaign propaganda and misrepresentations require[s] Board intervention . . . ."). This court has recognized that it is within the Board's discretion to determine in what conditions employees will be deemed capable of evaluating wage comparisons. *Peerless of America, Inc. v. NLRB,* 576 F.2d 119, 125 (7th Cir.1978). A reviewing court may not substitute its judgment for the Board's on whether those

conditions are met if the Board's judgment is supported by substantial evidence. *See NLRB v. Lyon & Ryan Ford, Inc.,* 647 F.2d 745, 750 (7th Cir.), *cert. denied,* 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981). If those conditions are met the closeness of the vote does not call into question the election's validity. *See NLRB v. Southern Health Corp.,* 514 F.2d 1121, 1125 (7th Cir. 1975); *NLRB v. Visual Educom, Inc.,* 486 F.2d 639, 643 (7th Cir.1973).

The company also objects to several other instances of alleged misrepresentations: a statement, first made two weeks before the election, that the employer discharged all but eight pro-union employees following a prior unsuccessful campaign; a statement, made twenty-six days before the election, that the company's contracts prevented it from ceasing business; a statement, made twenty-six days before the election, that the employer could not reduce wages and benefits if the union won; and a statement, made fifty-one days before the election, that the employer could not close the plant and start any other business anywhere in the country. Apart from any other considerations, these statements do not constitute a basis for invalidating the election under the *Hollywood Ceramics* rule because, as the regional director noted, *Mosey Manufacturing Co.,* No. 25–RC–6619, at 6, 7 n. 4, the employer had ample time to reply.

I conclude that under the *Hollywood Ceramics* standard (a standard that has not been challenged as arbitrary, capricious, an abuse of discretion, or contrary to law), the Board would refuse to certify election results only in extraordinary circumstances, and that substantial evidence supports its determination that such circumstances were not present here. The majority concedes that if the Board's certification was proper under this standard as well as under the

---

* A week before the election the company sent the employees a letter titled "CARPENTER ORGANIZER'S PUT UP OR SHUT UP CHECKLIST," which challenged the employees to ask

the union to subscribe to the following pledge, among others:

I guarantee that if the Carpenter's Union wins the election you will receive a bigger wage increase than you would receive without the Union.

Signed: _____   Date: _____
Carpenter's Union Representative

still more restrictive *Shopping Kart/Midland* standard, we must enforce its bargaining order, because the company has not then been prejudiced by the Board's vacillations. *Ante* at 613. My conclusion that *Hollywood Ceramics* has been satisfied therefore is dispositive. Because I consider the majority's analysis to be fatally flawed in other respects as well, however, I explain my additional reservations below.

## II

The majority argues that we cannot be certain that the Board would apply the *Shopping Kart/Midland* standard to this case, and the consequently necessary remand (assuming that the result would be different if *Hollywood Ceramics* criteria were applied) would create such delay that future enforcement of the bargaining order would be inequitable. But the Board has expressed its intention to apply its current rule retroactively, in accordance with its usual practice. *Midland*, 263 N.L.R.B. No. 24, at 21 n. 24. Courts often enough remind agencies of their duty to follow their own rules that it would be odd for us to assume that the Board might not do so in this case.

Moreover, we have good indications that the Board would not consider this an extraordinary case, calling for an exception to its retroactivity rule. In *Rex-Hide, Inc.*, 241 N.L.R.B. 1178, 1179 n. 7 (1979), after noting its traditional practice of applying new rules to all pending cases, the Board applied the *Hollywood Ceramics* rule to an election conducted under that standard, challenged under *Shopping Kart*, and decided under *General Knit*. It reasoned that the shifts in policy did not penalize the parties because the standard it applied was identical to the one in effect at the time of the election. *See also Miller's Pre-Pared Potato Co.*, 240 N.L.R.B. at 1302 & n. 4. The same reasoning applies here: it is not inequitable to review an election conducted during the reign of *Shopping Kart* by that very standard, because the interim shifts in Board policy could not have affected the parties' behavior. Indeed, the present case is a stronger one than *Rex-Hide* for retroactivi-

ty because the Board now considers campaign propaganda an unfit subject for review, making the parties' behavior irrelevant. It would be irrational for the Board to scrutinize propaganda that it considers categorically immaterial, even if the election had been conducted under a different standard or would have failed on more intrusive review. Whether the parties relied on the Board's rule by conforming their behavior to it is irrelevant to the extent that their behavior itself is deemed irrelevant.

I therefore conclude that the Board would apply *Midland* to this case, making certification proper even if the election would have been invalidated under the *Hollywood Ceramics* test (which I do not concede). It is unnecessary to remand this issue.

## III

The majority also argues that remand is necessary because we do not know how the Board would evaluate the company's nonmisrepresentation objections. But it is disingenuous to say that we are uninformed about the Board's view and that "Mosey has never had judicial review" of this issue, *ante* at 612, for the Board considered and rejected these objections long ago, *see Mosey Manufacturing Co.*, 205 N.L.R.B. at 553 (adopting the findings of the ALJ), and we may review that determination now. Contrary to the majority's assertion, *ante* at 612, the company did not rely wholly on its nonmisrepresentation objections when this case first was argued to this court; the core of its argument was misrepresentation even then, when it principally urged that the Board abused its discretion in adopting the *Shopping Kart* rule (an argument I find unpersuasive, as I stated above, because of the breadth of the Board's power to regulate election procedures). In any case, review of the non-misrepresentation objections is not impossible, even if the earlier briefs were more exhaustive on those issues, because those briefs are available and the facts are unchanged.

Apart from the alleged misrepresentations, the company urges that the election be set aside for three reasons: because of threats that coerced the employees' choice, because of improper union promises of benefits, and because of improper conduct of Board agents in refusing to reopen the polls for absent employees. The Board properly dismissed each of these objections.

### A

The company alleges that two threats tainted the election: first, some employees stated that pro-union employees would be discharged if the union lost; second, a burly, pro-union employee told another employee that if the union won, and there were a strike, and the other employee crossed the picket line, he would kill him. The Board, adopting the finding of the Administrative Law Judge, dismissed the objections because neither statement was attributable to the union, and neither was shown to have been coercive, because the first was a prediction about employer action beyond the union's control, and the second was not so widely circulated as to create a general atmosphere of fear, and was neither implicitly nor explicitly ratified by the union.

The Board properly dismissed these objections because the statements could not be imputed to the union. Threats or promises by third parties are tolerated to a greater degree than threats or promises by the union or employer, *see, e.g., NLRB v. Belcor, Inc.,* 652 F.2d 856, 860 (9th Cir.1981); *Beaird-Poulan Division, Emerson Electric Co. v. NLRB,* 649 F.2d 589, 594 (8th Cir. 1981); *NLRB v. Hepa Corp.,* 597 F.2d 166, 167 (9th Cir.), *cert. denied,* 444 U.S. 926, 100 S.Ct. 266, 62 L.Ed.2d 183 (1979); *NLRB v. Urban Telephone Corp.,* 499 F.2d 239, 242 (7th Cir.1974), and spoil an election only if they create a generally coercive atmosphere that prevents free choice. *See Beaird-Poulan,* 649 F.2d at 594. As I discuss below, the Board properly concluded that no such atmosphere was created here. When a union learns of such misconduct by its adherents and fails to disavow the statements to prevent the appearance of endorsement, the threats or promises may be imputed to it and call for stricter review. *See Urban Telephone,* 499 F.2d at 243. There is no evidence, however, that the union in this case learned of the alleged threats; indeed, the regional director noted that the union's campaign literature advised the employees of the illegality of strike violence. *Mosey Manufacturing Co.,* No. 25–RC–6619, at 5 n. 5. The union thus explicitly disassociated itself from the second category of threats.

Moreover, even if responsibility for the statements that pro-union employees would be discharged if the union lost could be imputed to the union, it was reasonable to consider them noncoercive, because discharge of employees was not within the union's control, nor, I venture to surmise, within its desires. A statement about future events beyond a party's control cannot be considered a threat. *See NLRB v. Bostik Division, USM Corp.,* 517 F.2d 971, 973 (6th Cir.1975). Indeed, even if we assume that the union had this power and that it could be known who voted for the union in the secret-ballot election, the only likely consequence of the "threats" would be to encourage opposition to the union to avoid possible discharge.

The company's objection to the threat of strike violence is weak for the same reason. As the regional director noted, *Mosey,* No. 25–RC–6619, at 5, an employee threatened with violence for crossing a hypothetical future picket line has an incentive to vote against the union in order to prevent the possibility of a strike; and in any case because the threat was not conditioned on the employee's vote in the election, the inference that it might have affected the voting is tenuous. For these reasons, the Board's finding that no coercive atmosphere was created is sound.

### B

The company further alleges that the union's statement that, if it won the election, it could "guarantee ... that [the employees'] Local will get as much, if not more, support as American Motors of Richmond did (they ended up with a first year pay

increase of around 10%)" was an improper promise of benefit that tainted the election. To the extent that this argument rests on the ground that the wage comparison was erroneous, I have already answered it above in discussing misrepresentations. But to the extent that the argument rests on the ground that promises of benefit are improper, it borders on the frivolous. The Board often holds that employers' promises of benefit if the union loses or threats of harm if it wins are coercive. *See, e.g., NLRB v. Flomatic Corp.,* 347 F.2d 74, 77 (2d Cir.1965) (unfair labor practice rather than representation context). The rationale is that, by wielding benefits within its power to grant or withhold, the employer may coerce the employees' choice. *Id.* This rationale has less force when a union's conduct is under scrutiny, because "[a] union can effectively promise only that it will try to gain certain benefits in bargaining sessions. In contrast, an employer appears as one who can fulfill any pledges he makes which seem to be reasonably within his means." *Id.* A union's promise of a particular wage increase would therefore lack credibility; but the union in this case did not even go so far, but merely promised energetic support. Such promises, even when phrased as guarantees, are proper. *See Archer Laundry Co.,* 150 N.L.R.B. 1427, 1435 (1965). *See also NLRB v. Savair Manufacturing Co.,* 414 U.S. 270, 279 n. 6, 94 S.Ct. 495, 500, 38 L.Ed.2d 495 (1973) (pre-election union promises or grants of benefits may be coercive only if not across the board to all employees); *id.* at 283, 94 S.Ct. at 502 (White, J., dissenting); *Wilson Athletic Goods Manufacturing Co. v. NLRB,* 164 F.2d 637, 639–40 (7th Cir.1947). This is particularly true in the context of a heated campaign such as this one, in which the company challenged the union to state what it could guarantee the employees. As one commentator has noted, "[t]he union's promise to improve working conditions, which takes the form of specific goals for wages, fringe benefits, grievance processing and the like, is inherent in every election campaign and is not regarded as unlawful." R. Gorman, *Basic Text on Labor Law* 170 (1976). That such

promises may influence votes does not make them coercive; by that standard, all useful information would be banned from campaigns.

C

Finally, the company argues that Board agents acted improperly in refusing to reopen the polls, after the ballots had been tallied, to allow two employees, one of whom was absent from work and the other of whom had fallen sick at work, to vote. It is a long-standing Board policy that a majority of votes cast by a representative group of employees, rather than a majority of eligible voters, is sufficient for certification. *See RCA Manufacturing Co.,* 2 N.L.R.B. 159, 173–78 (1936). Determination of procedures for the conduct of elections is entrusted to the Board's discretion. *See NLRB v. A.J. Tower Co.,* 329 U.S. 324, 330, 67 S.Ct. 324, 327–328, 91 L.Ed.2d 322 (1946); *NLRB v. Waterman Steamship Co.,* 309 U.S. 206, 226, 60 S.Ct. 493, 605–606, 84 L.Ed. 704 (1950). It was hardly an abuse of discretion to adopt the conventional election rule that a majority of actual voters determines the outcome. *See Virginian Railway v. System Federation No. 40,* 300 U.S. 515, 560, 57 S.Ct. 592, 605, 81 L.Ed. 789 (1937) ("Election laws providing for approval of a proposal by a specified majority of an electorate have been generally construed as requiring only the consent of the specified majority of those participating in the election. . . . We see no reason for supposing that [the Railway Labor Act] was intended to adopt a different rule."). This conclusion is not changed by the closeness of the vote, provided that the rule itself is neutral, favoring neither the union nor its opponents. *See NLRB v. A.J. Tower Co.,* 329 U.S. at 334–35, 67 S.Ct. at 329–330. In fact, adherence to the rule is especially warranted in this kind of case, because allowing post-election challenges to the procedures employed would invite delay of certification of election results, an evil to which the Board is sensitive, *see Midland,* 263 N.L.R.B. No. 24, at 15; would invite sabotage of the electoral process; and would invade the pri-

vacy of the voters—in particular, in this case, the two voters whose views the company was eager to include once the other votes had been counted. *See NLRB v. A.J. Tower Co.,* 329 U.S. at 332, 67 S.Ct. at 328–329 (post-election challenge to voter eligibility disallowed because of these dangers). Because the conduct challenged was the neutral application of a reasonable election rule, the company's objection was properly dismissed.

## IV

The fourth premise of the majority opinion is that delay between an election and a request to enforce an order to bargain is a sufficient reason to deny enforcement. This view overlooks the well-established principle that for one year following certification of a union, excluding time spent litigating unfair labor practice charges, there is a nearly irrebuttable presumption of continued majority status. *See Brooks v. NLRB,* 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954) ("certification year" rule was a proper exercise of the Board's discretion); *NLRB v. John S. Swift Co.,* 302 F.2d 342, 346 (7th Cir.1962) (excluding "the period during which the bargaining relationship was suspended by litigation of the Company's unfair labor practices"). Although the certification-year rule does not in terms apply to the present case because the issue before the court is whether the certification itself was proper, a clear corollary of the rule is that when certification of a bargaining representative following an election is otherwise proper, delay alone cannot destroy the presumption of continued majority status. *See NLRB v. Mr. B. IGA, Inc.,* 677 F.2d 32, 34 (8th Cir.1982) (per curiam); *NLRB v. Drives, Inc.,* 440 F.2d 354, 366–67 (7th Cir.) (events subsequent to the issuance of bargaining order, such as passage of time and employee turnover, should be disregarded by a court considering enforcement, even though the bargaining order was based on a card majority rather than an election), *cert. denied,* 404 U.S. 912, 92 S.Ct. 229, 30 L.Ed.2d 185 (1971). Otherwise it would always benefit an employer who opposed the union to refuse to bargain, because it would gain not only delay of its duty to bargain with the employees' duly elected representative, as Mosey has in this case, but also the possibility of avoiding the duty to bargain altogether. These are precisely the concerns underlying the Supreme Court's decision in *Brooks,* 348 U.S. at 104, 75 S.Ct. at 181 (Without the certification-year rule, "encouragement would be given to management or a rival union to delay certification by spurious objections to the conduct of an election and thereby diminish the duration of the duty to bargain.").

Moreover, even apart from this rule, I am not convinced by the majority's assertion that enforcement of the bargaining order is inequitable in this case. The changes in Board policy have not prejudiced the employer: the company has achieved its goal of putting off collective bargaining for five and a half years, and its litigation expenses, particularly in light of my conclusion that the election was untainted, have no bearing on its duty to bargain now. The majority's concerns that enforcement would be inequitable to the employees because of the staleness of the election have been decisively dismissed by the Supreme Court, whose counsel we are bound to follow:

> Petitioner contends that whenever an employer is presented with evidence that his employees have deserted their certified union, he may forthwith refuse to bargain. In effect, he seeks to vindicate the rights of his employees to select their bargaining representative. If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board. If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit.... The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selec-

tion and rejection of bargaining agents and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence.

*Brooks,* 348 U.S. at 103, 75 S.Ct. at 181 (footnotes omitted).

Finally, even if equity did demand denial of enforcement when delay resulted in the union's loss of majority status, no such showing has been made here. Once an employer recognizes a union, under the certification-year rule majority status is nearly conclusively presumed; after that period the presumption continues but becomes rebuttable. *See NLRB v. Burns International Security Services,* 406 U.S. 272, 279 n. 3, 92 S.Ct. 1571, 1578 n. 3, 32 L.Ed.2d 61 (1972). To rebut this presumption, the employer has the burden of showing by objective evidence either actual loss of majority status or a good-faith doubt about its continuance. *See Orion Corp. v. NLRB,* 515 F.2d 81, 85 (7th Cir.1975) (per curiam). The passage of time is not sufficient to raise a good-faith doubt. *See NLRB v. Katz,* 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 1114 n. 16, 82 L.Ed.2d 230 (1962) ("The company urges that, because of the lapse of time ..., enforcement should be denied altogether or conditioned on the holding of a new election to determine whether the union is still the employees' choice as a bargaining representative. This argument has no merit."). Nor is high employee turnover sufficient. *See NLRB v. Sure-Tan, Inc.,* 583 F.2d 355, 361 (7th Cir.1978). In the present case the majority reverses the presumption, assuming that the passage of time and the possibility of turnover (about which we have no evidence) create a sufficient risk of loss of majority status to make a new election necessary. It is bizarre to entertain contrary presumptions depending on whether an employer has fulfilled its duty to recognize its employees' representative. In a similar case the Eighth Circuit found that "delay and employee turnover are not adequate reasons to set aside a certified election." *NLRB v. Mr. B. IGA, Inc.,* 677 F.2d at 34. In the past, we ourselves have refused to consider delay and turnover in decid-

ing whether to enforce a bargaining order, even when the order was not based on an election. *NLRB v. Drives, Inc.,* 440 F.2d at 366–67. If this court now decides to adopt a contrary rule and to deny enforcement of the bargaining order in this case, it should at least demand that its assumption about the union's loss of majority status has some foundation.

V

I conclude that the Board properly held the election untainted by misrepresentations under any standard; that in any case the Board would now apply a standard under which the majority concedes certification was proper; that the company's other objections to certification, which this court has the capacity to review now, lack merit; and that firmly established labor principles, unchanged by appeals to equity, require enforcement of the Board's order. I therefore dissent.